# United States Court of Appeals
## For the First Circuit

No. 22-1380

UNITED STATES,

Appellee,

v.

JAYNE CARBONE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Gelpí, Circuit Judges.

Zainabu Rumala, Assistant Federal Public Defender, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for appellee.

August 1, 2024

**THOMPSON, Circuit Judge**. According to the Centers for Disease Control and Prevention, the scourge of financial elder abuse is described as "the illegal, unauthorized, or improper use of an elder's money, benefits, belongings, property or assets for the benefit of someone other than the older adult." CDC, Fast Facts: Preventing Elder Abuse, https://perma.cc/7F9B-3ZBY (last visited May 10, 2024). And that is what today's appeal is all about. Jayne Carbone ("Carbone") seeks to undo her conviction related to her theft of hundreds of thousands of dollars from her elderly (and now deceased) uncle, Wayne Kerr ("Kerr"). Following a five-day jury trial in October 2021, a federal jury in Massachusetts found Carbone guilty on all counts. On appeal, Carbone asks us to vacate and remand her case for a new trial because of the District Court's alleged procedural and evidentiary blunders. More specifically, she claims that the District Court erred by: (1) denying her counsel's motions to continue the testimonies of two key government witnesses; and (2) admitting those witnesses' testimonies at trial over her objections. Finding her claims meritless, for the reasons we'll discuss, we affirm.

## I. BACKGROUND

We briefly set forth the relevant facts of the case so that the reader can understand how Carbone was able to carry out her theft, and in doing so we note that "our recitation of the factual background is, of course, done in the light most

complimentary to the jury verdict."  United States v. Belanger, 890 F.3d 13, 17 (1st Cir. 2018).

### A. The Victim:  Wayne Kerr

Beginning in the early 2000s, Carbone became responsible for the primary care of her uncle.  Like many familial relationships, theirs was complicated.  However, before we examine the complex family dynamics underlying this case, we'll introduce Kerr to give some context to the issues at play.

Born in 1941, Kerr was a longtime resident of Chelsea, Massachusetts, where he resided in a first-floor apartment unit of a triple-decker home that he owned, and rented out, on Grove Street.  Kerr enjoyed a stable professional life, first working as an assistant manager for a local grocery store chain for twenty-four years before later managing the Chelsea Community Center (also known as the Chelsea YMCA or just simply the Chelsea Y) until his eventual retirement in 2016.  Upon his retirement, Kerr's income consisted of social security, pension checks, and rental income from his second- and third-floor Grove Street apartment units.  Kerr was also a modest man.  He did not gamble, regularly purchase clothes, invest in the stock market, take frequent vacations, use recreational drugs, or drink often. Instead, he was described as a homebody.  For reasons that will soon become clear, it's important to note that like many members of his generation, Kerr was not a technologically savvy man.  He

used neither email nor computers, and did not own a cell phone, or fax machine. Nor did he utilize credit cards or a checkbook. Instead, Kerr relied on tried-and-true methods, such as snail mail and cash, to conduct his affairs.

Kerr also possessed a peculiar relationship with money. His idiosyncrasies are probably best illustrated through his miserly saving habits that led him to shower at the Chelsea Community Center and collect his urine in a container, instead of flushing the toilet, to save money on his water bill. Kerr also mistrusted banks, leading him to store large sums of cash - $10,000.00 to $20,000.00 at a time - in his home safe, suitcase, and various shoeboxes. Yet, Kerr was also incredibly generous with his family and friends, often treating them to fine dinners and cash gifts. By the time he retired, Kerr had managed to accrue more than $500,000 consisting of: $160,265.50 in a Nationwide Life Insurance annuity account ("Nationwide account"); $330,560.76 in a Citizens Bank account; and a large sum of cash in his home safe.

Finally, Kerr also relied on familial assistance to conduct his personal affairs. Beginning with his mother, then his late sister (Carbone's mother), and eventually Carbone (we'll get to her shortly), Kerr depended on the women in his family to assist him with his chores. These tasks included, amongst other things, running errands, doing his laundry, cleaning, cooking, shopping,

banking, prescription pickup, and postal business. Near the end of his life, Kerr also suffered from Parkinson's disease and stage four metastatic cancer. With that brief sketch of Kerr's history in place, we'll next offer insight into Carbone's and Kerr's relationship before turning to the reason we're here.

**B. Carbone and Kerr: A Close Relationship**

Since her youth, Carbone enjoyed a special relationship with Kerr. That relationship began when Carbone and her siblings moved into Kerr's upstairs Grove Street apartment unit after Kerr's mother (Carbone's grandmother) passed away. Kerr acted as a fatherly figure, providing Carbone and her siblings with guidance, discipline, love, and financial support. Over the years, Kerr provided Carbone with ongoing financial assistance. For example, he paid for Carbone's first two vehicles, both of her weddings, IVF treatments, car repairs, gas, and various odds and ends. As she put it at trial, Kerr "just took care of me."

Importantly, Carbone served both as Kerr's professional assistant and as his personal assistant beginning in 1999 and 2003, respectively. Professionally, Carbone served as Kerr's executive assistant at the Chelsea Community Center for twenty-six years, in a role she described as being "Wayne's right-hand man." In that capacity, she answered the Center's phone, handled the Center's financial transactions and technology, and generally assisted Kerr with miscellaneous administrative tasks. Outside of work, Carbone

also managed Kerr's personal affairs following her mother's death in 2003. Like her predecessors, Carbone orchestrated Kerr's errands. She also handled Kerr's finances, including hand delivering his bank statements to him, paying his bills, collecting his rental income, and setting up his bank accounts. As compensation for Carbone's considerable labor, Kerr acknowledged that he amended his will to leave Carbone the Grove Street property and also designated her the beneficiary of his Citizens Bank account. However, despite Carbone's access to Kerr's finances, he said he never granted her permission to transfer funds from his Nationwide Life or Citizens Bank accounts or to use funds from those accounts for her personal use. As we'll soon see, this lack of permission did not deter Carbone from helping herself to his stash.

### C. Carbone's Scheme

Despite their bond, Kerr's and Carbone's relationship was changing, though unbeknownst to Kerr.

In 2017, several clandestine withdrawals from Kerr's Nationwide account served as a harbinger of trouble to come. Beginning with a $30,000 withdrawal on July 6, 2017, Kerr's account was subjected to a series of five-figure withdrawals. Notably, each withdrawal, which incidentally listed Carbone's contact information, was transacted from the Boston Marine Society, where Carbone had recently begun working. In 2018, Carbone initiated

another four withdrawals from Kerr's Nationwide account, totaling $55,000. By July 30, 2018, Kerr's Nationwide account had been reduced from $160,265 to $2,736.32. $105,000 of Kerr's Nationwide money was siphoned into Kerr's Citizens Bank account, while $57,000 was deposited directly into Carbone's own Citizens Bank account.

And Carbone also preyed on Kerr's Citizens Bank account. Evidence presented at trial showed that between January 3, 2017 and September 5, 2018, Carbone withdrew a total of $454,787.13 from the account - into which, recall, she directed $105,000 of Kerr's Nationwide funds during the same period - using a series of checks that were sent via U.S. mail to Kerr at his Grove Street residence. This snail-mail delivery was important because further evidence showed that, in 2016, Carbone told David Sacco ("Sacco"), the U.S. Postal Service carrier covering Grove Street, that she was taking control of Kerr's finances. And she therefore requested that he place a hold on Kerr's home mail delivery, which he did beginning in January 2017. Following Carbone's directive, Sacco began personally remitting all of Kerr's mail to her. Financial forensic data revealed that Carbone deposited Kerr's stolen funds into her various bank accounts and withdrew large sums of cash during this period. When all was said and done, Carbone had transferred a total of $511,787.13 from Kerr's Nationwide and Citizens Bank accounts to herself.

During this period, Kerr's finances weren't the only thing in flux. Carbone's relationship with her kinfolk became strained when, out of the blue, she started denouncing her family and questioning her lineage. Carbone also began displaying a noticeable socioeconomic status upgrade, evidenced by a recently purchased Lexus SUV, frequent vacations, and designer clothing and handbags. Additionally, she picked up a new trick of the fraudster trade: falsifying financial documents and bank statements, her mechanism for keeping Kerr in the dark about her thievery. Beyond the statements' inaccurate amounts, Carbone's manufactured false documents featured the marks of an amateur swindler, such as suspicious varying fonts, crooked and off-center numbers, and traces of white-out strips. By creating these phony documents, Carbone was able to falsely represent to Kerr that first, his Citizens Bank account had a balance of over $330,000 when, in actuality, it was in the red, and second, his Nationwide account had more than $160,000 when, in actuality, it contained a pittance, just $2,700. Her efforts to cover her tracks didn't end there. Further discovery revealed that Kerr's Citizens Bank account included a September 2017 letter purportedly authorizing Carbone to handle all of Kerr's banking transactions and granting her a

durable power of attorney if Kerr became disabled or incapacitated.[1]

### D. Kerr's Discovery

As is often said: What's done in the dark will come to light. That light shone on September 3, 2018, when Kerr called his nephew (Carbone's brother) "[d]evastated, depressed, [and] angry" after he'd spoken with a financial advisor at Citizens Bank. The bank's money-man informed Kerr that his accounts had been wiped out. Enlisting the help of a couple of other relatives — his niece and nephew (Carbone's sister and brother, respectively) — Kerr began reviewing and dissecting his financial records and bank statements and the fraud was unearthed. Yet, the identity of the perpetrator remained unknown until Carbone, while responding to inquiries about Kerr's funds, sent a series of texts implicating herself.[2] Once Kerr's assets turned up missing, Carbone began

---

[1] No evidence surfaced indicating Kerr was ever disabled or incapacitated prior to the fraud's discovery.

[2] In one notable text to her sister, Carbone stated:

> I will talk to you later if you want but for
> the immediate response I will start putting
> money back but I'm turning this around I'm
> not going to feel bad if he wants to do this
> and take some kind of action I am going to
> blow other shit up that is not going to be
> pretty.

In another revealing text exchange, Carbone said "I can slowly start putting it [(the money)] back but I do not want to text what I want to say but maybe it would be easier but right now I am

throwing around allegations of sexual abuse, accusing her brothers of molesting her as a child with her sister looking on without intervention, and accusing Kerr of molesting her three brothers when they were children.

### E. Procedural Background

In due course, a four-count federal indictment issued,[3] trial got underway, and Carbone was found guilty by a jury of her peers.[4] Relevant to Carbone's appeal is the court's admission — over her objections — of two key government witnesses' testimonies. First is Kerr, whose video deposition was taken before trial because he was dying, and then later was shown to the jury on the second day of trial. Her next challenge is about Christine Brown ("Brown"), Carbone's former employee at the Chelsea Community Center, whom the government offered as a rebuttal witness to establish (among other things) a potential motive for Carbone's actions. Unhappy with the proceedings below, Carbone timely appealed, leading us here.

---

blaming him for the abuse I endured as a child and it was absolutely his fault!"

[3] Carbone was charged with four counts of wire fraud under 18 U.S.C. § 1343 and four counts of aggravated identity theft under 18 U.S.C. § 1028A(a)(1).

[4] At sentencing, the District Court meted out a sentence of fifty-four months' immurement, three years' supervised release, and restitution in the amount of $493,729.94.

- 10 -

## II. DISCUSSION

Before us, Carbone launches several arguments, which, when reduced to each's core essence, amount to two primary contentions:  (1) that the court did not afford her counsel sufficient time to adequately prepare for Kerr's and Brown's testimonies; and (2) that the court improperly admitted their testimonies at trial.  We'll start with Carbone's challenges to Kerr before turning our attention to Brown.

### A. Kerr's Deposition:  Motion for Continuance

We'll begin with Carbone's challenge to the court's denial of her requests to continue Kerr's deposition.

On May 18, 2021, prior to Carbone's trial, the government filed an assented-to motion under Rule 15 of the Federal Rules of Criminal Procedure to conduct Kerr's testimony by deposition in order to preserve it for trial because his health was in decline.[5] The District Court granted that request on June 4th.  On June 10th, after learning from a family member that Kerr's condition had taken a turn for the worse, the government notified the court and Carbone of its intention to depose Kerr five days later on June 15th.  The following day, Carbone, in response, moved to continue Kerr's deposition for thirty days (which would have been July 15th), arguing that the government's notice was unreasonably short and

_____

[5] In doing so, the government noted that Kerr was suffering from stage four prostate cancer and had an uncertain prognosis.

- 11 -

consequently did not afford her counsel sufficient preparation time. The court agreed, and issued an order that same day, concluding that while sympathetic to the government's need to expeditiously secure Kerr's testimony, its notice was, in fact, unreasonably short. However, in reaching that conclusion, the court denied Carbone's request for the thirty-day continuance she requested and instead ordered the government to come up with an expeditious but reasonable alternative date by that forthcoming Monday, June 14th, which it did. The government proposed June 24th, explaining that it was fourteen days from when it originally filed its deposition notice, and to further simplify matters, it committed to limiting its direct examination of Kerr to twenty minutes. Reiterating the need for urgency in capturing Kerr's vital testimony and relying on a statement from Joyce Agri ("Agri"), a nurse at Kerr's assisted living facility familiar with his medical history, the government stressed "it is difficult to predict with certainty the course of Mr. Kerr's medical condition from day to day, but that any day he may no longer be able to participate in a deposition."

That same day, Carbone, after receiving notice of the court's decision, moved for reconsideration, requesting the court grant her a continuance, this time until June 30th to prepare for Kerr's deposition. She argued that the government's notice was not only unreasonable because of the deposition's abbreviated

timeline, but also prejudicial because it deprived her counsel of adequate preparation time. The government countered that the date was reasonable considering Kerr's failing health and the deposition's intended brevity. The court denied Carbone's motion for reconsideration and sided with the government, concluding that the revised deposition date was reasonable under the circumstances. Accordingly, Kerr was deposed on June 24th.

Against this backdrop, Carbone tells us that the court erred when it denied her motion to continue Kerr's deposition for the thirty days she had requested. That is so, she argues, because the court's ruling was based in part on a "misplaced emphasis" on the government's estimate of time it would need to conduct its direct examination. However, says Carbone, the brevity of the government's projected direct examination bore no correlation to the time she would need to adequately prepare a cross-examination of Kerr. She emphasizes that because Kerr's deposition testimony was taken in anticipation of his inability to testify at trial, her counsel needed the same preparatory time she would ordinarily require in order to properly prepare for a trial cross-examination, and that here, effective assistance of counsel would particularly require "the time-consuming tasks of reviewing years of financial transactions and legal documents to ascertain the verbal and written permissions provided by Kerr to Carbone, and consulting with Carbone and case investigators."

Notwithstanding the customary and arduous demands of trial preparation, Carbone also contends that her counsel's preparation time was restricted even further by a pre-scheduled, non-refundable, international travel plan which would leave her without access to reliable technology. And the court was timely made aware of these shortcomings that impinged on her counsel's availability. In explaining why her attorney should not be faulted for her personal scheduling conflicts, Carbone points out that although her counsel anticipated Kerr would need to be deposed before trial, she had no reason to be fully prepared to cross-examine Kerr by mid-June since the case wasn't calendared for trial until October of that year (2021). Turning to Kerr's health problems, Carbone says that despite the court's concern about the potential permanent loss of Kerr's testimony, the record lacks sufficiently reliable evidence that the additional six days (that she requested in her subsequent reconsideration motion) would have rendered Kerr permanently unable to testify or posed an insurmountable inconvenience to the court or government because "there is nothing in the record to corroborate [Agri's] statement concerning [Kerr's] potential inability to be deposed." Accordingly, given the centrality of Kerr's testimony and her counsel's lack of adequate preparation time, Carbone claims she suffered prejudice from the District Court's refusal to grant her more time.

Unsurprisingly, the government disagrees. As a threshold matter, the government says Carbone has waived any argument relative to both of her motions.[6] Notwithstanding waiver, the government maintains that Carbone's challenge to the court's

------

[6] The government spills much ink arguing that Carbone has waived her challenge to either of the court's rulings below. Waiver as to the continuance motion because she did not separately address it in her brief. Waiver as to the court's reconsideration decision because her briefing similarly fails to address the relevant reconsideration standard. Our perusal of Carbone's overall briefing causes us to disagree with the government's assessment. In her reply brief, Carbone responds to the government's waiver contention like this:

> It was only after that [reconsideration] motion that the court entered an order, D.E. 61, explaining its reasons for the earlier order [denying her request for a 30-day extension]. . . . It is clear [Carbone] is challenging the denial of the motion to continue the deposition for 30 days and there has been no waiver. In any event, the government acknowledges that the standard of review for the denial of a motion for a continuance and a motion to reconsider remains the same--abuse of discretion.

The gravamen of Carbone's arguments, even if maybe not as artfully presented as they could be, is clearly aimed at the District Court's denial of her requests for more time to depose Kerr. Given Carbone's failure to persuade us on any of her legal theories, we will proceed to consider her challenge to both District Court motion decisions collectively, employing the assessment standards for the denial of continuance (as she appropriately argues), and do so through the review lens of abuse of discretion. See United States v. Williams, 630 F.3d 44, 48 (1st Cir. 2010) (explaining that we review a court's denial of a defendant's motion to continue for abuse of discretion); see also United States v. Allen, 573 F.3d 42, 53 (1st Cir. 2009) ("We review the denial of a motion for reconsideration for abuse of discretion.").

rulings which allowed her some but not all of the extension relief she requested fails because the government's notice was reasonable, especially under the circumstances here. It also contends that Carbone's challenge to the sufficiency of Agri's medical statement outlining the decline of Kerr's health is meritless, particularly since she did not substantively attack it below, but instead only reiterated her need for additional preparation time.[7] Therefore, according to the government, we should affirm the District Court's decision because the record clearly indicates that the court carefully balanced the parties' interests and concerns in making its determination — the very antithesis of abuse of discretion. And, continues the government, Carbone cannot show prejudice as her counsel's cross-examination spanned forty pages (as opposed to the ten pages of the government's direct examination), thereby demonstrating she was able to adequately explore multiple topics at length. And, the government argues, Carbone's failure to identify any specific information she would have uncovered if the deposition had been held on June 30th (or, for that matter, July 15th) rather than on

---

[7] The government points out that in moving for a Rule 15 deposition and opposing Carbone's continuance motion, "[it] represented that Kerr was suffering from stage-four cancer that had spread to his spine and back, that his medical condition was deteriorating, and that a registered nurse who worked at Kerr's assisted living facility and was familiar with his medical history had said that 'at any time' he may no longer be able to participate in a deposition."

the June 24, 2021 court-ordered deposition date further undermines her claim.

We begin our review by charting the guiding legal principles relative to continuances. "District courts enjoy broad discretion in managing their dockets." Delgado v. Pawtucket Police Dep't, 668 F.3d 42, 50 (1st Cir. 2012); see also United States v. Maldonado, 708 F.3d 38, 42 (1st Cir. 2013). And in light of this management responsibility, the trial court, when presented with a continuance motion, is obligated to consider "the reasons contemporaneously presented in support of the request for the continuance." West v. United States, 631 F.3d 563, 568 (1st Cir. 2011) (citation omitted). It is also required to consider (among other things): the amount of time needed versus the time available; the movant's diligence and whether the movant contributed to their perceived predicament; the complexity of the case; the extent of any inconvenience to others (such as the court, witnesses, and the opposing party); and the likelihood of injustice or unfair prejudice resulting from the denial of the continuance. Id.

Because of the latitude we afford the court's docket-juggling act, we review the denial of a continuance motion "look[ing] primarily to the persuasiveness of the trial court's reasons for refusing the continuance and give[] due regard not only to the factors which inform that court's ruling but also to

- 17 -

its superior point of vantage." Delgado, 668 F.3d at 50 (second alteration in original) (citation omitted). It is the aggrieved party who bears the burden of demonstrating to us that in refusing the continuance request, "the district court exhibited an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." Id. (citation and internal quotation marks omitted). Therefore, we review the District Court's denial of Carbone's continuance motion for abuse of discretion. See United States v. Rosario-Otero, 731 F.3d 14, 18 (1st Cir. 2013). And, under this standard, we will not disrupt the District Court's decision if reasonable minds could disagree about the proper ruling. See Maldonado, 708 F.3d at 42. Moreover, in our scrutiny of a plaint to overturn a trial judge's denial of a continuance motion, we pay close attention to the likelihood of injustice or prejudice resulting from the denial of a continuance motion and "consider this final factor [of prejudice] to be essential." United States v. Delgado-Marrero, 744 F.3d 167, 196 (1st Cir. 2014). Accordingly, we overturn when the movant has "identifie[d] specific, concrete ways in which the denial resulted in 'substantial prejudice' to his or her defense." Id. (citation omitted); see, e.g., United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995).

We think that when the court describes a factor as "essential," it should be viewed by appealing litigants as a clear

heads-up to either make a substantial prejudice showing or risk losing on appeal. Delgado-Marrero, 744 F.3d at 196. Focusing our attention then, on that essential factor here, we can resolve Carbone's claim with some dispatch — Carbone, having failed to heed the message, has not shown prejudice resulting from the court's decision to deny her continuance motion. This is Carbone's prejudice argument:

> Kerr was the only person with first-hand knowledge who could testify that Carbone was not authorized to [withdraw money from his accounts]. Had counsel been provided additional time to review the discovery and investigate, counsel would have had a better opportunity, as stated in the opposition to the admission of the deposition, to "uncover[] highly significant but previously unknown information regarding Kerr's financial and other activities," . . . and an ability to meaningfully cross-examine Kerr and test his credibility.

Other than providing a general description of the perceived inconvenience of a slightly expedited deposition, Carbone does not point to, as our precedent requires, "specific, concrete ways" that the court's denial of her continuance motion actually prejudiced her defense. Id. Although she speculates that a continuance may have provided her more time to discover additional information about Kerr's finances and other activities, she does not point to any specific or concrete evidence, witness information, or strategy that she might have otherwise utilized had she been granted an additional few days. See Maldonado, 708

- 19 -

F.3d at 43-44 (affirming the district court's denial of the defendant's motion for continuance because the defendant made no showing that any specific and compelling prejudice resulted from the denial of his motion); cf. United States v. Pérez-Ruiz, 353 F.3d 1, 8-9 (1st Cir. 2003) (explaining that "some showing of prejudice beyond mere assertion is required in the delayed disclosure context"). For instance, Carbone makes no assertion that financial or other relevant documents surfaced between June 24th, the day Kerr was deposed, and June 30, 2021, the continuance date she sought (or even July 15th, the date of her original request), that were important to her defense, or contradicted or called into question any statement Kerr made during his deposition, or that caused her to be deprived of an opportunity to probe or impeach Kerr's credibility. Although Carbone vaguely alludes to probative financial statements and data, she fails to specify what they are or how they would have been useful in her cross examination of Kerr. Nor does she delineate what questions she would have posed at a later deposition that she was unable to ask on June 24th. Her generic supposition that if given additional time her counsel would have had an opportunity "to meaningfully cross-examine Kerr and test his credibility" tells us nothing useful for our analysis. Again we emphasize, generalized claims of prejudice do not suffice to make a showing of substantial

prejudice to one's defense.  See Delgado-Marrero, 744 F.3d at 196.

Accordingly, Carbone's claim fails.[8]

**B. Kerr's Deposition:  Testimony at Trial**

Next, we turn to Carbone's argument challenging the admissibility of her uncle's deposition testimony at trial.  On appeal, Carbone says the District Court's error was twofold when it admitted Kerr's deposition testimony.  We'll address each argument in turn.

1. Kerr's Competency Determination

First up, Carbone argues that the District Court stumbled when it failed to hold a competency hearing before admitting Kerr's deposition testimony, contending she was deprived of the opportunity to establish Kerr's incompetency at the time he

---

[8] Pushing back, Carbone argues that the government concedes that new allegations surfaced post Kerr's deposition about him sexually abusing third parties.  And therefore, Carbone postulates, she could have questioned Kerr about those allegations to raise doubts about his credibility.  But Carbone makes no argument that she learned of these allegations between June 24th and July 15th (which is the timeframe she complains of on appeal).  Without some explanation about how this later-learned information impacted her ability to question Kerr had her specific reconsideration plea for more time been granted, we fail to see the relevance of her argument.  And further, Carbone never moved to depose Kerr again in the lead up to trial after learning about these new allegations.  All in all, under the circumstances presented here, we cannot conclude that the court abused its discretion when it denied Carbone the full extension she requested. See Saccoccia, 58 F.3d at 770 ("[T]he decision below must endure unless the party who moved for the continuance can demonstrate that, in withholding relief, the trial court indulged a serious error of law or suffered a meaningful lapse of judgment, resulting in substantial prejudice to the movant.").

- 21 -

sat for his deposition.  Before diving in, we first set the stage so that the reader can understand the debate which transpired below.

On September 28, 2021, just days before the start of trial, the government filed a motion in limine requesting a preliminary ruling on the admissibility of Kerr's deposition.  In it, the government contended that Kerr was unavailable to testify under Federal Rule of Evidence 804(a)(4)[9] due to his medical infirmity, and it therefore asked the court to allow admission of a video of his deposition.  To demonstrate Kerr's unavailability, the government submitted an affidavit from Dr. Saira Nisar ("Dr. Nisar"), the medical director at Kerr's assisted living facility.  Dr. Nisar's assessment was bleak, noting that Kerr was suffering from metastatic cancer, immobility, and cognitive decline.  She explained that:

> Since June 2021, Kerr has declined both physically and cognitively. . . .  In order to treat his pain and spasms, Mr. Kerr is receiving painkillers as well as muscle relaxants.  These include the narcotic Oxycodone and Baclofen.  Given Mr. Kerr's age and condition, such medications would have an impact on his cognition, for example, his memory and ability to understand.  Since June 2021, Mr. Kerr has also been treated for a urinary tract infection twice, in August 2021.

---

[9] Rule 804(a)(4) provides that "[a] declarant is considered to be unavailable as a witness if the declarant: . . . cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness . . . ."

> Given Mr. Kerr's age, these infections would also have an impact on his cognitive ability. Mr. Kerr is currently unable to have complex conversations or sustain a conversation for anything other than a short period of time. Based on my medical expertise and my regular contact with Mr. Kerr, it is my opinion that he is currently not physically able to provide in-person testimony at a trial, and there is no reasonable likelihood that he will become physically able to do so in the future. Further, even if he was physically able to provide in-person testimony, it is my opinion that Mr. Kerr's cognition has diminished since June 2021 to the point that he is not currently able to sustain complex conversations or conversations for anything other than a short period of time.

Carbone filed an objection to the government's motion, arguing three grounds. Reason one, she argued that the government had not actually proven Kerr's unavailability and because of that, she asked the court to: (a) hold a hearing to test Dr. Nisar's allegations regarding Kerr's purported unavailability; and (b) order the government to hand over Kerr's medical records to her in advance of said hearing. Second, relying on Dr. Nisar's conclusions about Kerr's cognitive decline, Carbone requested that the court schedule a competency hearing to assess whether Kerr had sufficient mental acuity to testify at trial — in other words, whether Kerr was actually an unavailable witness — and also to assess whether he was, in fact, competent at the time of his deposition. Third, Carbone reiterated her protestation that the

rush to depose Kerr had deprived her of a meaningful opportunity to cross-examine him.

In turn, the government disputed Carbone's arguments questioning Kerr's competency at the time he sat for his deposition, arguing, among other points, that: Kerr's deposition testimony demonstrated his competence to testify; and because Carbone did not challenge Kerr's competency before or during his deposition she "should not be permitted to bootstrap [Kerr's] current unavailability to attack his past competency in an effort to shield the jury from hearing his testimony, particularly on the eve of trial." The government also provided the court with a copy of Kerr's video deposition. Wrapping up, the government emphasized Kerr's unavailability to appear at trial given his extremely impaired health.

Whether Kerr would be deemed an unavailable witness remained unresolved until the court's final pre-trial conference. During that proceeding, the court granted the government's motion in limine on the admissibility of Kerr's deposition, reasoning:

> I don't see any alternative but to allow that. That was the reason why the deposition was taken. And in this day of COVID, I think it would be cruel to require someone who, as I understand it, is suffering from Alzheimer's to actually appear in court. . . . I think

> the motion in limine by the government to proceed by way of deposition is allowed.[10]

Importantly for purposes of this appeal, the court made no ruling on Carbone's requests for a competency hearing or access to Kerr's medical records. In due course, Carbone's trial got underway and Kerr's deposition testimony was admitted, over Carbone's objection, and played for the jury. Kerr passed away later that day.

On appeal, Carbone says the court erred in not conducting a competency hearing before admitting Kerr's deposition. As she puts it, "[she] was deprived of the opportunity to establish a record that Kerr was not competent at the time of his deposition." In support of her argument, Carbone cites to a case from a sister circuit, United States v. Crosby, 462 F.2d 1201 (D.C. Cir. 1972), wherein the court enunciated what it said was the common law principle with respect to a witness's capacity, to wit, that any witness must be competent to testify, and that "once a trial judge is confronted by any 'red flag' of material impact upon competency of a witness, an inquiry must be made into the facts and circumstances relevant thereto." Id. at 1203 (emphasis in original). Carbone says there were red flags galore — "sufficient indication that Kerr could not accurately recollect or recollect

---

[10] This was a temporary mix-up on the court's part. Kerr was not suffering from Alzheimer's disease but instead was afflicted with Parkinson's disease and terminal cancer, as noted.

at all information that was critical to his [deposition] statements." And this spotty[11] and inconsistent[12] performance "coupled with the medical affidavit that affirmed Kerr's mental regression since [the] June 2021 [deposition] was enough to warrant a competency hearing." And this is so, she continues, in spite of Federal Rule of Evidence 601, which establishes a presumption of competency as to all potential witnesses.

In support of her argument, she highlights several aspects of the record which she says undergird her contention that a competency hearing was necessary before Kerr's deposition could be admitted. For instance, "[t]he record reveals nothing about the medications [he] was taking or their impact on any cognitive abilities." And, Carbone states, the record belies Kerr's assertion, at deposition, that he did not personally notice any cognitive side effects from his medications.

---

[11] Specifically, she points to Kerr's inability to remember: information about his accountant; the year he left his job at Stop & Shop to work at the YMCA; when he retired from the YMCA; and his conversation with an attorney about his assets pending a civil lawsuit.

[12] Carbone points to the following inconsistencies in Kerr's deposition testimony: he did not give Carbone authorization to receive emails on his behalf but when provided evidence of his written authorization he stated he believed them to be true he had given family members $50,000 in cash but later stated that he had given them $5,000; he recanted his recollection about how his medical expenses were paid for; and his statements regarding his retirement plan with the YMCA.

In Carbone's view, the cloud of doubt hanging over Kerr's competency only grew darker when Dr. Nisar concluded that Kerr had cognitively declined since his deposition. That's important, Carbone says, because although Dr. Nisar began caring for Kerr in June 2021 when he entered the medical facility, there is no indication in the record that she ever assessed Kerr's cognitive baseline upon his admission, nor is there evidence she reviewed his health care history to evaluate whether there had been any decline in his mental acumen prior to June 2021. And, Carbone continues, given Kerr's extended illness (most notably, his battle with Parkinson's disease), it cannot be presumed that his mental deterioration only began in June 2021 or that he was competent at the time of his deposition. The questionability of Kerr's competency only deepened, Carbone asserts, given testimony from several trial witnesses suggesting an earlier onset of Kerr's cognitive decline.[13] And although this later information unearthed at trial may not have been known prior to the court ruling Kerr's testimony admissible, it is information, Carbone maintains, that could have been gleaned from a competency hearing prior to the

_____

[13] Specifically, Carbone points to her witnesses' testimonies to make her point. One testified that Kerr began calling her the wrong name in 2016 even though she had known Kerr her entire life. Another testified that, in his opinion, Kerr began showing signs of dementia around 2015-16, and that Kerr became very forgetful and revealed personal, confidential information which he had asked Kerr to keep private.

court rendering its decision. Even without this information, Carbone maintains that "[t]he content of Dr. Nisar's affidavit, coupled with Kerr's contradictory statements and faulty memory, should have triggered further examination by the court." Accordingly, she claims prejudice from the court's denial of her competency hearing request, and further asserts that the court's error was exacerbated by its refusal to provide her access to Kerr's medical records.

The government insists that the court was not required to conduct a competency hearing. It argues that Carbone's reliance in Crosby is misplaced as it predates Rule 601 and is therefore dead-letter law. And, the government explains, with the adoption of Rule 601, the question of competency goes to the issue of credibility which is solely within the province of the trier of fact. Furthermore, given both Rule 601's presumption of a witness's competency and the broad latitude we afford a district court in determining whether such a hearing is warranted, the District Court's decision was a proper exercise of its discretion. That is so, the government maintains, because the record contains adequate evidence of Kerr's competency at the time his deposition was conducted as he "was able to answer questions and communicate relevant information."[14] Furthermore, the government asserts that

_____

[14] The government points out that, in his deposition, Kerr was able to: provide his full name, date of birth, age, address, and

the contents of Dr. Nisar's affidavit and Kerr's allegedly contradictory statements, which form the foundation of Carbone's challenge, go to Kerr's credibility, not his competency, and therefore are issues reserved for the jury's determination. Finally, the government counters, Dr. Nisar's statement that Kerr had cognitively declined since his deposition focused on Kerr's medical condition as of September 2021 and did not in any way address his capacity on the day he was deposed or suggest that Kerr was incompetent at the time.[15]

Here's our take. More than a century ago, the Supreme Court said that even a "lunatic or a person affected with insanity is admissible as a witness if he ha[s] [a] sufficient understanding to apprehend . . . the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue." D.C. v. Armes, 107 U.S. 519, 521-22 (1883). Federal Rule of Evidence 601 codifies this

---

educational history; identify the medical conditions he was suffering from; confirm that the medications he was taking were not impacting his memory as far as he knew; clarify that his Parkinson's disease made him feel unsure of himself and inadequate with respect to his speech; identify Carbone as his niece and identify the ways he had assisted her; identify Carbone's children and the gifts he had given them; and state that he had not given Carbone authority or permission to transfer money out of his bank accounts for her personal use.

[15] Given our no-abuse-of-discretion determination, we bypass the government's alternative argument that Carbone forfeited any claim concerning the testimony of two trial witnesses who allegedly raised doubts about the onset of Kerr's cognitive decline.

well-established principle and in relevant part provides, as we earlier noted, that "[e]very person is competent to be a witness unless these rules provide otherwise." Fed. R. Evid. 601. The Rule and advisory committee's notes make clear that the Rule leans towards inclusion and are particularly illustrative, explaining that: "[n]o mental or moral qualifications for testifying as a witness are specified"; "[d]iscretion is regularly exercised in favor of allowing the testimony"; and "[a] witness wholly without capacity is difficult to imagine." Fed. R. Evid. 601 advisory committee's notes to 1972 proposed rules. They further specify that "[t]he question [of capacity] is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence." Id.[16]

---

[16] By its own terms, Rule 601's general grounds-clearing language could be read to suggest that incompetency could never be grounds for excluding testimony except in situations expressly provided for by the rules. But the government does not take such an absolutist position, and we therefore assume that a district court retains discretion to decide the threshold issue of witness competency as is pertinent to its evidentiary admissibility assessment. For example, in United States v. Ramirez, 871 F.2d 582, 584 (6th Cir. 1989), the Sixth Circuit explained that:

> The authority of the court to control the
> admissibility of the testimony of persons so
> impaired in some manner that they cannot give
> meaningful testimony is to be found outside of
> Rule 601. For example, the judge always has
> the authority under Rule 403 to balance the
> probative value of testimony against its
> prejudicial effect. Similarly, under Rule
> 603, the inability of a witness to take or
> comprehend an oath or affirmation will allow

Our case law has followed suit. See Eisen v. Picard, 452 F.2d 860, 865 n.8 (1st Cir. 1971). In United States v. Hyson, 721 F.2d 856, 864 (1st Cir. 1983), we held that a witness's competency to testify is left, in the first instance, to the trial judge's determination. We further explained that, because there is no provision within Rule 601 for the exclusion of a mentally incompetent witness's testimony, "[t]he question of competency goes to the issue of credibility, which is for the trier of fact." Id. Later, in United States v. Devin, 918 F.2d 280, 291-92 (1st Cir. 1990), we again held that witnesses are presumed competent to testify and that the determination of competency is reserved for the trial court. And although, unlike here, both the Hyson and Devin courts opted to conduct some form of competency hearing, we reiterated our broad rule that the courts' decisions to do so were

the judge to exclude that person's testimony. An argument can also be constructed that a person might be impaired to the point that he would not be able to satisfy the "personal knowledge" requirement of Rule 602.

See also Sinclair v. Wainwright, 814 F.2d 1516, 1523 (11th Cir. 1987) ("[W]e are obliged to remand for a determination on the record of the competency of the witness[.] . . . If the witness was incompetent, then, unless admission of his testimony was harmless beyond a reasonable doubt, a violation of due process should be found and judgment entered accordingly."). Moreover, subsequent to the adoption of Rule 601, our circuit has reviewed two cases involving a district court's assessment of competency, and we found no abuse of discretion in the different procedures utilized therein. See, e.g., United States v. Hyson, 721 F.2d 856 (1st Cir. 1983); United States v. Devin, 918 F.2d (1st Cir. 1990).

discretionary calls.  See Devin, 918 F.2d at 291-92; Hyson, 721 F.2d at 864.

The question Carbone asks here is whether the District Court improperly exercised its discretion when it elected not to hold a competency hearing.[17]  Given the circumstances of the case before us, we think not and here's why.  We have long reprised that even a criminal defendant "is not entitled as of right to an evidentiary hearing on a pretrial or posttrial motion."  United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993).  Therefore, to garner such a hearing, we've explained that a defendant "carr[ies] a fairly heavy burden of demonstrating a need for [such] special treatment."  Id.; see also United States v. Panitz, 907 F.2d 1267, 1273-74 (1st Cir. 1990) (collecting cases).  When the competency of a witness is questioned, the general rule we just articulated

---

[17] Carbone makes this clear in her reply brief:

> The government denies Carbone's allegations as to the competency of Kerr, stating that "Kerr was able to answer questions and communicate relevant information."  This misses the point. Carbone has not argued that the entirety of Kerr's deposition was unintelligible.  Nor is that the standard to trigger a competency hearing.  What Carbone has argued is that there is sufficient indication that Kerr could not accurately recollect or recollect at all information that was critical to his statements.  This coupled with the medical affidavit that affirmed Kerr's mental regression since June 2021 was enough to warrant a competency hearing.

does not get displaced: "[T]here is no legal requirement that the trial judge conduct a formal hearing." United States v. Gerry, 515 F.2d 130, 137 (2d Cir. 1975). Instead, the trial judge's obligation is to make "such an inquiry as will satisfy the Court that the witness is competent to testify but the form of that inquiry rests in the discretion of the trial court." Id.; see also Henderson v. United States, 218 F.2d 14, 17 (6th Cir. 1955) (explaining that the competency of a witness is a question reserved for the trial court and "[i]f the competency of a witness is challenged before testifying, it is the duty of the Court to make such examination as will satisfy it of the competency or incompetency of the witness"); United States v. Odom, 736 F.2d 104, 111 (4th Cir. 1984) (explaining that the necessity of holding a hearing on the preliminary question of a witness' competency is a matter within the discretion of the trial court).[18] Even Federal Rule of Evidence 104, which directs the trial court to decide preliminary questions about a witness's qualifications or the admissibility of evidence, does not prescribe the need for an evidentiary hearing in order to make such a determination. See Fed. R. Evid. 104.

---

[18] That said, when the competency of a criminal defendant is in question, a different set of rules apply. See United States v. Muriel-Cruz, 412 F.3d 9, 10 (1st Cir. 2005) (determining whether a competency hearing for a criminal defendant was adequate under 18 U.S.C. § 4241 and § 4247(d)).

Here, necessarily underlying the District Court's ruling that Kerr's June 24th deposition testimony was admissible was the court's threshold determination that Kerr was, in fact, sufficiently competent to testify at his deposition. In making that threshold determination, the court had before it several submissions relevant to its assessment of Kerr's mental capacity, those being: Carbone's requests for a competency hearing and access to Kerr's medical records; legal briefs containing the parties' vastly different takes on Kerr's competency; Carbone's admissibility challenges arising in part from Kerr's deposition transcript and in part from Dr. Nisar's affidavit; and, of particular import, Kerr's video deposition which allowed the court to observe Kerr's demeanor and gauge his ability to respond to questions in real time. After a thorough review of all the information and arguments at hand, the District Court, in the end, was satisfied that a competency hearing was not needed to further evaluate Kerr's mental capacity at the time he was deposed, and accordingly, it exercised its broad discretion to admit the testimony.

Based on our own examination of the record (and assuming Crosby's common law principles might have some ongoing jurisprudential purchase) we cannot find fault in that decision. See Devin, 918 F.2d at 292 (explaining that we will overturn a finding of competency only for an abuse of discretion); see also

Crosby, 462 F.2d at 1202 ("We are cognizant . . . that the competency of a witness is a matter which addresses itself to the sound discretion of the trial court . . . .").

In reaching that conclusion, we first observe that when the government first sought to take Kerr's deposition, Carbone agreed to the request and as such, the government submitted an assented-to Rule 15 deposition motion, which the court granted. Subsequently, as outlined at length above, contentions arose between the parties primarily involving the timeframe for conducting the deposition. Amid that dispute and in support of its request to depose Kerr sooner rather than later, the government reported to the court that it had spoken with Agri (a nurse at Kerr's facility, recall) about the status of Kerr's health. Agri explained, as we earlier noted, that it was difficult to predict with certainty the course of Kerr's medical condition from day to day given his terminal illness diagnosis, and she opined that Kerr could reach a point where he would no longer be able to participate in a deposition. Presumably — so that Carbone could verify Agri's professional assessment of Kerr's overall medical condition had she, in the exercise of due diligence, opted to do so — the government provided Carbone with Agri's contact information.

However, and of import here, nothing in the record (i.e., no affidavit from counsel) indicates that Carbone ever availed herself of an opportunity to speak with Agri prior to Kerr being

deposed — either about Kerr's overall medical condition or whether any of his diagnoses or any of his medications could or would impact his mental cognition. Nor is there anything in the record to suggest Carbone ever sought to access Kerr's medical records prior to (or at the time of) his deposition being taken. In other words, Carbone declined to make her own independent assessment of Kerr's competency, even though it is the party challenging a witness's competency who bears the burden of demonstrating incompetency. See, e.g., von Hirsch v. Olson, No. 2:21-cv-00107-NT, 2023 WL 3115063, at *5 (D. Me. Apr. 27, 2023) (explaining that when a party challenges a witness' competency, it is their burden to overcome Rule 601's presumption that said witness is competent to provide testimony);[19] Swanger v. Diversified Treatment Alts.,

---

[19] We briefly note that the factual scenario of von Hirsch is somewhat akin to the scenario before us here. In that case, the plaintiff called the cognitive abilities of von Hirsch into question from the start of the litigation, asserting that von Hirsch had been diagnosed with Parkinson's disease and possessed significant "cognitive symptoms . . . which . . . made him vulnerable to exploitation." von Hirsch, 2023 WL 3115063, at *1. Despite that warning, and two doctors' opinions that von Hirsch was not competent to provide deposition or in-person testimony, von Hirsch was deposed by the defendant. Id. at *3. "No other information or updates on the issue of von Hirsch's competency were provided by either party; no competency hearing was requested or held; and no competency determination [had] been made." Id. The plaintiff later sought to exclude von Hirsch's deposition testimony on the ground that he was not competent at the time of his deposition and continued to be incompetent on the eve of trial. Id. at *5. The district court noted Rule 601's presumption of competency and held that it was therefore the plaintiff's burden of overcoming that presumption. Id. And, upon review, the court found that the plaintiff had not met that burden of demonstrating

No. 4:11-CV-894, 2019 WL 430929, at *3 (M.D. Pa. Feb. 4, 2019) ("The party challenging the competency of a witness bears the burden of proving the incompetence."); Lopez v. Meluzio, No. CV 05-0009, 2006 WL 3833115, at *5 (E.D.N.Y. Dec. 29, 2006) ("The burden of proving a witness's incompetence lies with the objecting party.").[20] Further indication that Carbone had no concerns about Kerr's competency when deposed can be found in her Continuance Motion, filed in response to the government's motion to schedule Kerr's deposition. Its focus was not on any reservations about Kerr's then-present mental capacity, but rather on Carbone's need for additional preparation time.

We also observe that on the day Kerr was deposed, no restrictions were placed on Carbone regarding the substance or

---

that von Hirsch was incompetent at the time of his deposition or before trial because the doctor's report, that he pointed to in making his case, could not serve as a basis for a competency determination and a review of his deposition testimony demonstrated that von Hirsch was relatively coherent at times, despite some moments of confusion and/or forgetfulness. Id.

[20] See also Koeppel v. Bassett, No. 08-cv-04543, 2015 WL 857701, at *2 (D.N.J. Feb. 27, 2015) (holding that a party objecting to a child's competency, on the belief that the child might have been unduly influenced, "must show that the child did not perceive the events in question or is testifying from suggestion rather than her own recollection; mere assertion of such concerns is not enough"); United States v. Skorniak, 59 F.3d 750, 755 (8th Cir. 1995) (noting that the defendant's statement that his brother was "not competent to testify due to his mental state . . . insufficient to overcome the presumption embodied in Federal Rule of Evidence 601 that all witnesses are presumed competent to testify" (internal quotation marks omitted)).

length of the deposition. Carbone could have and did to some extent probe Kerr's mental capacity. That is, she posed a few questions to Kerr about his neurological and cognitive symptoms, and about the "ton" of medications he was taking and their impact on his thinking. Nonetheless, as the government rightly noted below, Carbone, neither prior to nor at the conclusion of Kerr's deposition, placed any objection on the record questioning or challenging Kerr's competency because of any overt, behavioral manifestations. This is so, even after she had the opportunity, for over an hour, to observe firsthand Kerr's ability to comprehend and answer questions posed to him in real time. See United States v. Berrios-Rodriguez, 768 F. Supp. 939, 940-41 (D.P.R. 1991) ("The failure to challenge the competence of a witness at the time his testimony is presented, acts as a waiver to later objections of competency."); see also Fed. R. Crim. P. 15(g) ("A party objecting to deposition testimony or evidence must state the grounds for the objection during the deposition.").

Then, with Kerr's actual deposition performance in the backdrop, Carbone never, on her own, initiated any procedural action — think for example, a motion in limine, see Swanger, 2019 WL 430929, at *3 — seeking to bar the admissibility of the deposition. That is important because as the District Court noted, "that was the reason why the deposition was taken," and if Carbone had reason to question Kerr's capacity when deposed, we believe it

would have been reasonable for her to promptly bring that concern to the District Court's attention. This is particularly true when everyone understood that Kerr was the government's key witness (in fact Kerr was the only witness who could rebut Carbone's assertion that she acted at all times with his consent) and likewise understood that Kerr's terminal illness would likely prevent him from being able to take the stand when trial did get underway (or in legal lingo, make him an unavailable witness). It was only after the government, months later and on the eve of trial, moved to admit Kerr's deposition due to his severe medical deterioration that Carbone, in her opposition to the government's motion,[21] first expressed any concerns about Kerr's competency and requested a competency hearing to retrospectively assess Kerr's mental acumen, and to also access his medical records.[22]

Carbone seems to contend that it wasn't until she reviewed Dr. Nisar's affidavit and (it seems) further reflected upon Kerr's purported deposition inconsistencies that materially

---

[21] In her opposition to the government's motion, Carbone never submitted any affidavits in support of her request for a competency hearing, such as affidavits from her two trial witnesses who described their perceptions of Kerr's cognitive decline and whose testimony she highlights to partially prove Kerr's alleged incompetence.

[22] We remind the gentle reader that the District Court had Kerr's medical records before it at the time it made its decision about whether a competency hearing was needed, but that those documents are not before us for our consideration as neither party made them part of the appellate record.

impactful red flags began to fly, generating questions about Kerr's deposition competency, thus spawning the need for a hearing to sort it all out before trial. However, once again, we are not persuaded. As the government points out, Dr. Nisar's affidavit only speaks of Kerr's cognitive decline post deposition. And Carbone's assertion that we should view Dr. Nisar's affidavit in conjunction with Kerr's deposition performance to infer possible pre-deposition incompetency warranting further in-court evidentiary investigation is not reasonably supported by the record, at least not by the record before us. Instead, when we evaluate Carbone's complaints about Kerr's testimony being "spotty" and "inconsistent" in places — and keep Rule 601's straightforward admissibility guidance in mind — we determine that, contrary to her assertions, Kerr's deposition fairly demonstrates that he was able to sufficiently comprehend and digest relevant information, adequately process the questions asked of him, and evince a reasonable ability to respond. And those areas of Kerr's deposition where he allegedly could not recall certain information or accurately respond to certain questions are more properly viewed as issues of credibility, not competency, best reserved for the jury. See Hyson, 721 F.2d at 864.

Therefore, in sum and on the particular facts of this case, we detect no abuse of discretion given: the latitude we afford the District Court on how best to assess a witness's

competency; Carbone's failure to sufficiently demonstrate that "red flags" of material impact existed that warranted the special treatment of a competency hearing, see Crosby, 462 F.2d at 1201; Rule 601's overwhelming presumption of a witness's competency, see Fed. R. Evid. 601, and Carbone's failure to rebut that presumption, see von Hirsch, 2023 WL 3115063, at *5; our reluctance to second-guess a district court's threshold competency determination, see Devin, 918 F.2d at 291; and our belief that a reasonable person could agree with the trial judge's decision, see United States v. McCullock, 991 F.3d 313, 317 (1st Cir. 2021) (explaining that "we will find an abuse of discretion only when left with a definite conviction that 'no reasonable person could agree with the judge's decision'" (quoting United States v. Cruz-Ramos, 987 F.3d 27, 41 (1st Cir. 2021))).[23] Accordingly, given our conclusion, we need not consider Carbone's prejudice argument.[24]

---

[23] We do hasten to add that it would not have been error had the District Court chosen to conduct a competency hearing. Nevertheless, we cannot say that its decision to decline Carbone's request to do so constitutes reversible error.

[24] We address a couple of other loose ends before moving on. First, the court was not necessarily required to explicitly deny Carbone's request for a competency hearing — as Carbone urged at oral argument before us — because its rejection was manifest in its decision to admit Kerr's testimony. Second, with respect to the government not turning over Kerr's medical records, Carbone summarily states that not "allow[ing] defense counsel access to [them] requires reversal" given the centrality of Kerr's testimony and the questions about his competency. However, we deem this

### 2. Adequacy of Cross-Examination

Carbone alternatively claims the District Court erred in admitting Kerr's deposition testimony because (to use legal-lingo terminology) the reliability of that testimony was not "assured." This is so, she says, because due to the deposition's hasty timing, her counsel lacked an adequate opportunity to cross-examine Kerr on important issues that surfaced only post deposition. That information involved serious sexual abuse allegations against Kerr — allegations which would have been critical to the jury's assessment of Kerr's credibility. And since Kerr was the only person who could contradict Carbone's version of events — her insistence that she had obtained permission from Kerr to move his assets around — the admission of the deposition prejudiced her. In light of her counsel's inadequate preparation time and because critical information could not be addressed, Carbone's argument goes, she was deprived of a greater opportunity to cast doubt on Kerr's credibility.

The government first contends Carbone's claim is waived.[25] But notwithstanding waiver, the government argues that

---

argument waived for lack of developed argumentation. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Further, as we earlier noted, Carbone did not make Kerr's medical records part of the appellate record here.

[25] Waived, says the government, because Carbone's isolated and vague references to Kerr's sexual abuse allegations neither

Carbone's claim lacks merit.  Because a record review clearly demonstrates that Carbone, through her counsel, had an opportunity to — and did — fully cross-examine Kerr, the reliability of Kerr's testimony was assured in the manner our case law so establishes.[26]

Before we tackle the arguments, a discussion of evidentiary fundamentals will be useful.

"Where, as here, objections to evidentiary rulings are preserved, review is for abuse of discretion." United States v. Kilmartin, 944 F.3d 315, 335 (1st Cir. 2019).  Although this standard is deferential, it "does not render trial court decisions impervious to scrutiny."  Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 83 (1st Cir. 1998).  We've held that abuse of discretion sounds worse than what it really is.  Schubert v. Nissan Motor Corp. in U.S.A., 148 F.3d 25, 30 (1998).  Rather, it just means that "when judicial action is taken in a discretionary matter, such action cannot be set aside by a

---

identify the allegations in her opening brief nor describe how they are relevant to her case, all of which runs afoul of our well-established principle that claims "must be presented fully in an appellate brief and not by cross-reference to claims made in the district court." United States v. Reyes-Rivera, 812 F.3d 79, 90 n.13 (1st Cir. 2016).  Because we see no merit to Carbone's argument, we discuss waiver no further.

[26] For good measure, the government notes that because Carbone does not separately argue that Kerr's deposition testimony was inadmissible as hearsay to which the exception for a witness's unavailability would apply under Rule 804(b)(1), any such claim would be waived and nonetheless meritless.

reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Id. (quoting In re Josephson, 218 F.2d 174, 182 (1st Cir. 1954)).

If we determine that the court abused its discretion in admitting evidence, we next ask whether that error was harmless. See United States v. Fulmer, 108 F.3d 1486, 1498 (1st Cir. 1997). That question essentially asks whether the admission of the evidence "result[ed] in actual prejudice because it had a substantial and injurious effect or influence in determining the jury's verdict." United States v. Shay, 57 F.3d 126, 134 (1st Cir. 1995) (citation omitted). "To sustain the verdict, the reviewing court must be able to say with a fair degree of assurance that the erroneous ruling did not substantially sway the jury." Ruiz-Troche, 161 F.3d at 87.

We can bypass the issue of waiver because Carbone's claim fails for the same reason we found her argument about the motion to continue the deposition lacking: she has not shown prejudice. Again, here's how Carbone frames her prejudice argument: "The admission of the deposition prejudiced Carbone. Because counsel was forced to take Kerr's deposition without adequate preparation, critical information was not addressed and Carbone lost a greater opportunity to cast doubt on the credibility of Kerr -- a vital government witness." Beyond the speculative and conclusory nature

of Carbone's asseveration, Carbone never tells us what further information she would have gained, or what "critical information" she would have probed, had she been allowed to depose Kerr on June 30th (or July 15th) rather than June 24th.[27]  To merely maintain without detailing or specifying how the court abused its discretion when it admitted Kerr's deposition testimony because she was not provided, as she puts it, a greater opportunity to cross-examine Kerr, does not demonstrate prejudice.  See Kilmartin, 944 F.3d at 338 (explaining that if we determine that a court has abused its discretion in admitting evidence we consider whether that error was harmless and that "question reduces to whether admission of this evidence 'results in actual prejudice because it had a substantial and injurious effect or influence in determining the jury's verdict'" (quoting Ruiz-Troche, 161 F.3d at 87)).  We espy no abuse of discretion in the District Court's decision to admit Kerr's deposition testimony and so we soldier on.

### C. Brown's Trial Testimony:  Motion to Exclude for Late Notice

Carbone next challenges the court's admission of the testimony of Brown, Carbone's former employee at the Chelsea

---

[27] We note that even though Carbone was accusing Kerr of sexually abusing her brothers when they were children, an allegation which if true might likely have impacted his credibility, she never probed these allegations during Kerr's deposition.  Nor did she delve deeply into allegations being investigated at the time and known to her that Kerr, himself, had pilfered money from the Y.

- 45 -

Community Center who the government offered as a rebuttal witness and whose testimony provided a motive for Carbone's offenses.

On September 29, 2021, just days before trial, Carbone submitted a potential witness list in anticipation of her case-in-chief that included Diana Oriole ("Oriole"), Carbone's best friend who testified about Kerr's forgetfulness and unique saving habits, and James Dwyer ("Dwyer"), a board member at the Chelsea Community Center who also testified about Kerr's perceived cognitive decline, amongst others. The following day, after interviewing Oriole and Dwyer, the government provided a Federal Rule of Evidence 404(b) notice (we'll get into what that means in a minute) to Carbone of its intention to ask questions at trial about Carbone's prior substance use disorder to establish a potential motive. On October 1st, the government notified Carbone that — after conducting additional interviews — it had learned about Brown, who told investigators that: she used to work with Carbone; Carbone had stolen cash from Kerr's home safe on multiple occasions to buy prescription pills; she had purchased prescription pills for Carbone; and Carbone previously suffered from substance use disorder.

Carbone filed a motion to exclude Brown's testimony on the basis that the government's 404(b) disclosure was unreasonably late, and the nature of Brown's testimony would require Carbone to produce witnesses to rebut it. The government countered that good

cause existed to excuse its late notice because it only became aware of Brown's existence after learning of and interviewing Oriole and Dwyer, Carbone's prospective witnesses. Nonetheless, the government represented that it would only call Brown as a rebuttal witness if necessary. At its final pre-trial conference, the court denied Carbone's motion to exclude Brown's testimony.

At trial, here's what happened. Once the government rested, Carbone elected to testify on her own behalf. During her direct testimony, she indicated that she had not taken any prescription pills following her substance use counseling in 2012 until her brief relapse in the summer of 2018, when she took several Percocet pills following a family altercation. She also alleged that Kerr had instructed her to withdraw funds from his accounts in anticipation of a pending civil lawsuit, some of which, at Kerr's direction, she used to pay personal and family expenses, the rest of which she tendered to Kerr in cash. On cross-examination, when asked about Brown, Carbone denied ever stealing money from Kerr's safe with Brown. When asked about her prescription pill usage, she again stated that she had not taken any pills between 2012 and 2018 and had never stolen money from Kerr. Upon the conclusion of her case, the government called Brown to the stand over Carbone's objection and request for a continuance.

On the stand, Brown testified consistent with her pre-trial statement to the government: she had previously worked as Carbone's personal assistant at the Chelsea Community Center from sometime in 2014-15 or until late 2015-early 2016; she observed Carbone enter Kerr's residence during that period; and Carbone told her that she was taking money from Kerr's safe to purchase Oxycodone and Percocet pills. Brown also told the jury that she had observed Carbone take prescription pills, which Brown had purchased for Carbone with the looted cash Carbone had given her. At the end of her testimony, Carbone's counsel addressed the court, saying, "Your Honor, I would respectfully request a continuance as well to further cross-examine" Brown, which the court denied.

On appeal, Carbone repeats her claims that the court erred when it allowed Brown to testify because her counsel did not receive reasonable notice, under Rule 404(b)[28] and Local Rule 117.1(a)(4)(B),[29] that the government intended to call Brown to

---

[28] As we'll further discuss momentarily, Rule 404(b) generally makes inadmissible most character evidence regarding prior bad acts in order to show that a defendant acted in conformity therewith. See Fed. R. Evid. 404(b). But it does allow admissibility for other permitted purposes provided the defendant receives reasonable notice of the evidence to be offered before trial or during trial for good cause shown. Id.

[29] In relevant part, Local Rule 117.1(a)(4)(B) provides that, "[a]t the initial pretrial conference the district judge must[] . . . unless the declination procedure provided by [Local Rule] 116.6 has previously been invoked, order the government to

testify about Carbone's prior bad acts. At a minimum, Carbone says, the court should have granted her a continuance to prepare for Brown's testimony because the government disclosed Brown's intended testimony only four days before trial began. In Carbone's opinion, adequate preparation would have required her counsel to not only investigate Brown to assess her credibility, but also to explore other ways of rebutting Brown's damaging testimony. Yet, the time constraints, she says, prevented her counsel from doing so. Finally, Carbone claims that the court's error was prejudicial and not harmless because the government presented no other first-hand evidence that she had previously stolen money from Kerr, and such evidence was likely used as propensity evidence by the jury.

The government says we should affirm, contending the court's denial of Carbone's motion was a proper exercise of the court's discretion because the circumstances surrounding the government's discovery and disclosure of Brown supports the conclusion that its 404(b) notice was reasonable. It also states that its notice satisfied Rule 404(b)(3), which allows the government to provide notice of prior-bad-acts evidence during

---

disclose to the defendant no later than 21 days before the trial date: . . . a general description (including the approximate date, time and place) of any crime, wrong, or act the government proposes to use pursuant to Fed. R. Evid. 404(b)." L.R., D. Mass. 117.1(a)(4)(B).

trial if good cause exists, which it did here. Finally, the government argues that Carbone's Local Rule argument is misplaced because Local Rule 117.1(a)(4)(B) is modifiable in the interests of justice, which the court appeared to have done here "as the pretrial order the court issued did not include the requirement that the government provide any Rule 404(b) disclosures to the defense no later than 21 days before the trial date."[30]

Before we dive into the arguments, a brief discussion of Rule 404(b) will be useful. As we know, Rule 404(b) prohibits using "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with [it]." Fed. R. Evid. 404(b)(1). Essentially, the Rule prevents the introduction of propensity evidence. In a criminal matter it also obligates the government to provide reasonable notice of its intent to introduce evidence of a defendant's prior crimes, wrongs, or other bad acts "before trial -- or in any form during trial if the court, for good cause, excuses lack of pretrial notice." Fed. R. Evid. 404(b)(3)(C). Beyond this, the Rule does not impose a specific timeframe on the government, although the Rule's advisory

---

[30] More specifically, the government cites to Local Rule 117.1(b), which states that "[t]he district judge who will preside at trial may, upon motion of a party or on the judge's own initiative, modify any of the requirements of subsection (a) of this rule in the interests of justice." L.R., D. Mass 117.1(b).

committee notes state that "what constitutes a reasonable request or disclosure will depend largely on the circumstances of each case." Fed. R. Evid. 404(b) advisory committee's note to 1991 amendments.

A survey of our case law suggests that our circuit has not yet had an occasion to squarely consider the specific circumstances under which the timeliness of the government's 404(b) disclosure would be deemed reasonable. However, law from our sister circuits provides us with well-reasoned guidance for interpreting the Rule. See United States v. Watson, 409 F.3d 458, 465–66 (D.C. Cir. 2005) (finding no reversible error where defendant did not demonstrate prejudice flowing from forty-eight-hour 404(b) notice); see also United States v. White, 816 F.3d 976, 984–85 (8th Cir. 2016) (finding the government's one-week 404(b) notice reasonable under the circumstances); United States v. Preciado, 336 F.3d 739, 745 (8th Cir. 2003) (concluding that the government's one-week 404(b) notice was reasonable and timely under the circumstances); United States v. Blount, 502 F.3d 674, 678 (7th Cir. 2007) (finding that the government's 404(b) notice was timely when it occurred a week before trial); United States v. Perez-Tosta, 36 F.3d 1552, 1561–62 (11th Cir. 1994) (concluding that disclosure was timely and holding that the following factors are determinative in considering a disclosure's reasonableness: (1) when the government could have learned of the

availability of the witness; (2) the extent of prejudice to the opponent of the evidence from a lack of time to prepare; and (3) the significance of the evidence to the government's case).  We review this preserved challenge for abuse of discretion.  United States v. Quesada-Bonilla, 952 F.2d 597, 603 (1st Cir. 1991).

Upon review, we detect no error stemming from the District Court's denial of Carbone's motion to exclude because the record indicates that the government's disclosure of Brown's prior-bad-acts testimony was reasonable under the circumstances.[31] Out of the box, there is nothing in the record suggesting the government intentionally withheld information from Carbone or was negligent or dilatory in conducting its pre-trial investigation, a factor courts have looked to when considering whether the government's 404(b) disclosure was reasonable.  See United States v. Osarenkhoe, 439 F. App'x 66, 68 (2d Cir. 2011) (finding that the appellant failed to demonstrate that the government's disclosure was not "reasonable under Rule 404(b)" because she did not show "that the government was purposely withholding information from her or failed to discover the information due to its own negligence in conducting its pre-trial investigation").

---

[31] In reaching our conclusion, we also hold that Carbone's Local Rule argument fails because as the government rightly points out, it appears the court implicitly modified the Rule in the interests of justice, which it was permitted to do, when it ruled Brown's testimony admissible.  We detect no abuse of discretion in the court's decision to do so for the reasons outlined below.

Instead, the record reflects that the government only first learned about Brown's existence after interviewing Carbone's potential witnesses. And importantly, the record also reflects that the government, once it had spoken with Brown, promptly notified Carbone of its intention to call her to testify about Carbone's alleged prior bad acts. Under similar circumstances, courts have found the government's 404(b) disclosure to be reasonable. See Preciado, 336 F.3d at 745 (finding the government's 404(b) notice reasonable when it provided notice as soon as the prosecution became aware of the 404(b) evidence); see also United States v. Valenti, 60 F.3d 941, 945 (2d Cir. 1995) (holding that the government's 404(b) notice was reasonable when it provided documents to defendants the very day it obtained them); United States v. Green, 275 F.3d 694, 701–02 (8th Cir. 2001) (concluding that the government's 404(b) notice was reasonable because it provided notice the same day it learned about the evidence); Blount, 502 F.3d at 678. Accordingly, we see no error in the court's determination that the government's 404(b) notice to Carbone was reasonable and as such, see no abuse of discretion in the District Court's refusal to exclude Brown's testimony based on timeliness concerns.[32]

---

[32] Alternatively, Carbone argues that the court should have granted her a continuance before allowing Brown's testimony, and that it abused its discretion when it failed to do so. In her briefing, Brown describes a litany of activities she would have

**D. Brown's Trial Testimony:  Admission Over Rule 404(b)
Objection**

Carbone also challenges the evidentiary relevance of
Brown's testimony and thus the correctness of the court's decision
admitting it.  In her opinion, Brown's testimony was propensity
evidence irrelevant to any permissible Rule 404(b) purpose.
Despite the government's argument that Brown's testimony was
relevant to establish a motive for her crimes, Carbone says Brown's
testimony had to be tied to evidence that she illegally purchased
prescription pills during the relevant time period of her offenses,
and such evidence wasn't produced because there was none indicating
she had purchased pills between 2017-18 (the dates of her charged

---

undertaken if her request had been granted, i.e., engage in a
credibility assessment of Brown, search for new witnesses to rebut
Brown's accusations, evaluate the possibility of hiring an expert
witness "to challenge the government's anticipated contention that
Carbone stole the money from Kerr to fuel an expensive daily drug
habit."  Yet, fatal to her claim and unlike her briefing on her
continuance request relative to Kerr's deposition, she fails to
adequately discuss (beyond a cursory recitation of woulda-done's)
our relevant standard for reviewing the denial of a continuance
request or evaluate her claims of error in light of those factors.
(To remind, in evaluating a continuance denial, we scrutinize:
"the reasons contemporaneously presented in support of the
request, the amount of time needed for effective preparation, the
complexity of the case, the extent of inconvenience to others if
a continuance is granted, and the likelihood of injustice or unfair
prejudice attributable to the denial of a continuance."  United
States v. Rodríguez-Durán, 507 F.3d 749, 763 (1st Cir. 2007)).  As
a result of this omission, we won't drone on except to say "we see
no reason to abandon the settled appellate rule that issues
adverted to in a perfunctory manner, unaccompanied by some effort
at developed argumentation, are deemed waived."  Zannino, 895 F.2d
at 17.  Accordingly, we consider Carbone's continuance argument
waived.

offenses).  Therefore, in the absence of such evidence, Carbone asserts, Brown's testimony had no probative value.  Carbone continues, even if Brown's testimony could be deemed marginally relevant, it was too unfairly prejudicial to be admitted.

The government fails to address Carbone's specific timeframe argument and pivots instead to a discussion of why Brown's testimony possessed special relevance (a concept we'll explain shortly) under Rule 404(b).  This evidence was specially relevant, it says, because Carbone's defense at trial was that Kerr instructed her to withdraw money from his accounts in anticipation of a forthcoming civil lawsuit.  As a part of her argument, Carbone emphasized that the government could not locate the stolen funds she had withdrawn from her Citizens Bank account between August 2017 and August 2018.[33]  Therefore, in the government's view, Brown's testimony was specially relevant to establish a motive for Carbone's crime.

---

[33] Specifically, during her closing, Carbone's counsel stated:

> If [Carbone] had $310,000 they would have found it.  They didn't.  It's not there.  She doesn't have that.  She never had it.  She was giving it to [Kerr].  It's entirely consistent, however, with [Kerr's] entire life in the years leading up to the period of this indictment, right.  He wanted to draw down his annuity.  He wanted to keep his cash near him.  That is how he — that was his financial philosophy.  Keep your cash close.

As we have explained, Rule 404(b) prohibits the prosecution from introducing "evidence that is extrinsic to the crime charged" solely "for the purpose of showing villainous propensity."  United States v. Roszkowski, 700 F.3d 50, 56 (1st Cir. 2012).  To admit evidence of prior bad acts, a district court must find that the evidence meets two tests.  First, the evidence must have "'special relevance' to an issue in the case such as intent or knowledge, and must not include 'bad character or propensity as a necessary link in the inferential chain.'"  United States v. Varoudakis, 233 F.3d 113, 118 (1st Cir. 2000) (citing United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996)).  Specially relevant evidence is permitted when it is admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  "If the prior-bad-acts evidence is relevant only for the forbidden propensity inference, then the evidence is inadmissible under Rule 404(b)(1) and the inquiry ends."  United States v. García-Sierra, 994 F.3d 17, 29 (1st Cir. 2021).  Otherwise, we advance to step two, the application of Rule 403, requiring that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.  Id.; see also United States v. Sebaggala, 256 F.3d 59, 67 (1st Cir. 2001) (noting that Rule 404(b) "incorporates sub silentio the prophylaxis of Federal Rule of Evidence 403").

That said, we have cautioned that when prior-bad-acts evidence is offered to prove something relevant to the crime charged such as a defendant's motive for the crime, "courts must be on guard to prevent the motive label from being used to smuggle forbidden evidence of propensity to the jury." Varoudakis, 233 F.3d at 120 (citation omitted). "Where, as here, objections to other-acts evidence have been preserved, our review of rulings admitting or excluding such evidence is for abuse of discretion." United States v. Sabean, 885 F.3d 27, 35 (1st Cir. 2018); see also United States v. Gemma, 818 F.3d 23, 35 (1st Cir. 2016). We'll address each step in turn.

### 1. Special Relevance

We first ask whether Brown's testimony passes 404(b)'s initial special relevancy test. We answer yes because, as the District Court determined, the record shows that Brown's testimony was offered not to show that Brown had a propensity to steal or take opioids, but rather to provide a motive, aka a reason, for Carbone's theft: Carbone needed money to fund the substance use disorder Brown testified about. Carbone resists this conclusion by leaning on her timeframe argument. Here's how she frames it: "In the absence of evidence that Carbone engaged in the ongoing and significant illicit use of drugs and the illicit purchase of drugs between 2017 and 2018, testimony that she purloined funds

- 57 -

from Kerr to subsidize a drug habit prior to that time is irrelevant."

But Carbone acknowledged during her testimony that she suffered from substance use disorder from 2012 through 2014 following four major surgeries which necessitated opioid pain-management treatment. And she further acknowledged resorting to Percocet consumption in 2018 when she was processing and internalizing information she says she had learned about the circumstances of her childhood. Here's what she described:

> [T]he day before my bridal shower, I had a pill bottle in my medicine cabinet with four Percocet in it, and I took two the day before the bridal shower, and just not wanting to feel anything that had happened, that I found out, or anything, reliving everything that happened to me, and then the morning of the bridal shower, I took the other two.

Even though Carbone testified that the 2018 ingestion was the only slip after 2012 in an otherwise spotless addiction recovery, Brown's testimony, if believed, directly contradicted Carbone's account of pill purchasing and usage during the 2014-16 time period when the two worked together. Given the commonly known realities of addiction and the frequency of relapse as aptly demonstrated by Carbone's own resort to drugs when under duress, the court had ample reason to conclude that Brown's testimony supported the government's motive theory for why Carbone may have stolen money from Kerr. And Carbone gives us no authority supporting her

assertion that this prior-bad-acts evidence was too remote to the charged time period to be relevant. Her contention is particularly dubious since Brown's testimony gave rise to a reasonable inference that Carbone may well have been using drugs when the crimes occurred, and therefore, still in need of cash. The fact that the funds could never be located — a fact that Carbone harped on in her defense — also made the evidence especially probative.

Therefore, like the District Court, we conclude that Brown's testimony was specially relevant. See, e.g., United States v. DeCicco, 370 F.3d 206, 214 (1st Cir. 2004) (overturning the district court's exclusion of a witness's testimony when the government did not seek it for propensity evidence but rather to "establish the tax liabilities in order to show for what purpose the fraudulently obtained insurance proceeds were intended" — "[t]herefore, the motive of the charged mail fraud can be properly alleged to have been pecuniary gain, and therefore, the evidence was improperly excluded"); Sebaggala, 256 F.3d at 67-68 (finding no abuse of discretion when the district court admitted 404(b) evidence because "the stolen and altered travelers' checks were probative of motive on the false statement counts; their existence furnished a cogent reason for the appellant to lie to the customs inspectors about the value of the monetary instruments in his possession"); United States v. Appolon, 695 F.3d 44, 60 (1st. Cir. 2012) ("Daniel apparently had no legitimate source of disposable

income. Therefore, evidence that he used money derived from appellants' scheme to buy 'marijuana, clothes, vehicles, and firearms' had special relevance because it established his motive for participating in the scheme — his need to finance a lavish lifestyle."); United States v. Cole, 631 F.3d 146, 155-56 (4th Cir. 2011) (evidence of defendant's "lavish spending" was probative of his motive for violating tax laws). Accordingly, we proceed to step two.

### 2. Probative Value v. Unfair Prejudice

Though Brown's testimony was probative of Carbone's motive, the evidence must still clear the strictures of Rule 403, which provides that the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other concerns, "unfair prejudice." Fed. R. Evid. 403; see also Varoudakis, 233 F.3d at 121. "Unfair prejudice 'speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.'" United States v. DiRosa, 761 F.3d 144, 153 (1st Cir. 2014) (quoting Old Chief v. United States, 519 U.S. 172, 180 (1997)). We have held that a district court's discretion is especially broad, see Varoudakis, 233 F.3d at 122, and therefore "only rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning

the relative weighing of probative value and unfair effect," United States v. Doe, 741 F.3d 217, 229 (1st Cir. 2013) (cleaned up) (citation omitted).

Carbone does not accuse the District Court of failing to engage in Rule 403's probative-versus-prejudice balancing test. But she contends that even if Brown's testimony had some marginal relevance, any probative value it may have had was substantially outweighed by the dangers of its unfair prejudice to the case. We cannot agree. Despite the risks of what substance use disorder might inherently imply relative to issues of bad character or propensity, Brown's testimony was nonetheless highly probative of what may have motivated Carbone's larcenous conduct. And to repeat, as a part of her defense Carbone stressed to the jury that she was innocent, in part, because the government could not locate the stolen funds. Brown's testimony then, clearly rebutted Carbone's claim of innocence by providing a possible explanation for the funds' miraculous disappearance. Under these circumstances, Brown's testimony, as the District Court reasonably determined, was more probative than prejudicial and the court did not abuse its discretion in admitting it.[34]

---

[34] The government alternatively argues that Brown's testimony was admissible for impeachment purposes, specifically to impeach Carbone's statement that other than her brief rendezvous with Percocet pills in 2018 she had not abused drugs since 2012. See United States v. Sotomayor-Vázquez, 249 F.3d 1, 12 (1st Cir. 2001) (explaining that when a defendant denies engaging in conduct

Therefore, considering the totality of the circumstances and deference we afford a district court's on-the-spot judgment, for the reasons we've explained, we hold that the District Court did not abuse its discretion in admitting Brown's testimony.

### III.  FINAL WORDS

In sum, Carbone's convictions are **affirmed**.

---

material to the offense on direct examination, the government may offer testimony to impeach that denial); see also United States v. Catalán-Roman, 585 F.3d 453, 470 (1st Cir. 2009) (explaining that Sotomayor-Vázquez's holding is applicable "despite the prohibitions of Rule 404(b)").  The District Court did not rely on this backup argument, and since we agree with the government's primary one, we say no more.