# United States Court of Appeals
## For the First Circuit

No. 23-2074

UNITED STATES OF AMERICA,

Appellee,

v.

FERMIN CASTILLO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Barron, Chief Judge,
Montecalvo and Rikelman, Circuit Judges.

Michael Pabian for appellant.

Mark T. Quinlivan, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for appellee.

October 24, 2025

**MONTECALVO, Circuit Judge.** Defendant-appellant Fermin Castillo appeals his jury conviction and sentence for drug distribution and money laundering conspiracy violations. Castillo helped lead a fentanyl-distribution organization in Boston in 2020 and 2021. Discerning no reversible error among the many claims raised to us -- challenges to the district court's refusal to dismiss the indictment before trial; certain evidentiary rulings; alleged prosecutorial misconduct; aspects of the jury instructions; and aspects of sentencing -- we affirm.

## I. Facts

Because this appeal does not raise a sufficiency-of-the-evidence challenge, we rehearse the facts "in a 'balanced' manner." United States v. Martínez-Mercado, 132 F.4th 61, 65 (1st Cir. 2025) (quoting United States v. Lanza-Vázquez, 799 F.3d 134, 138 n.1 (1st Cir. 2015)).

From March 2020 to March 2021, Castillo worked with Cesar Alejandro Castro Pujols ("Castro") and Andre Heraux Martinez ("Heraux"), among others, to distribute fentanyl in Boston. Castillo lived in Mexico during this time. His role in the drug organization was to arrange many of the large drug sales and to organize the movement of proceeds back to Mexico. Castillo typically gave instructions to his Boston-based associates, including Castro and Heraux, over cell phones using WhatsApp. Although Castillo did not himself typically conduct drug sales or

- 2 -

money drops, he occasionally visited Boston and helped with the organization's on-the-ground work. For instance, Castillo visited Boston and helped Castro check for police presence before a money drop on August 31, 2020. And on December 14, 2020, Castillo again spent time in Boston -- including at a stash house at 800 Hyde Park Avenue with Heraux and Castillo -- before flying back to Mexico.

The drug organization primarily operated out of an apartment located at 800 Hyde Park Avenue, where Castro and others stored and prepared drugs. Members of the drug organization moved drugs and cash around the city using vehicles that were outfitted with hidden compartments. Castillo had organized the after-market installation of these compartments. In January 2021, officers searched one of these vehicles after having observed Heraux use it to conduct a money drop and found $150,000 in the hidden compartment. After months of surveillance, on March 23, 2021, law enforcement searched 800 Hyde Park Avenue (along with other locations) and seized multiple kilograms of fentanyl and related paraphernalia. These proceedings ensued.

## II. Procedural History

### A. Pretrial Proceedings

On April 15, 2021, a federal grand jury sitting in Massachusetts returned a two-count indictment charging Castillo and seven co-defendants -- including Castro and Heraux -- with

- 3 -

(1) conspiracy to distribute and possess with intent to distribute 400 grams or more of fentanyl and cocaine, in violation of 21 U.S.C. § 846; and (2) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).[1]  The district court issued an arrest warrant for Castillo that day.

In January 2022, Castillo was arrested in the Dominican Republic and flown to the United States.  On April 10, 2023, Castillo moved to dismiss the indictment on the basis of alleged outrageous government misconduct.  He argued that his arrest in the Dominican Republic by officers who he believed were U.S. Marshals violated the due process clause, Department of Justice policy, and the Mansfield Amendment to the Foreign Assistance Act, 22 U.S.C. § 2291(c).[2]  The government maintained that Dominican officers executed the arrest pursuant to a Dominican warrant and that, even if the arrest had been executed by U.S. agents, it did not comprise misconduct sufficiently outrageous to merit the indictment's dismissal.

The district court held a hearing on the motion to dismiss.  After hearing argument, the court found that, even

---

[1] By the time of trial, the operative charging document was a superseding indictment dated May 3, 2023, which charged Castillo and Heraux only with the same counts.  The charged time period in the superseding indictment spanned March 2020 to March 23, 2021.

[2] The Mansfield Amendment limits the power of officers of the United States to effect arrests in foreign countries.  See 22 U.S.C. § 2291(c)(1)-(2).

assuming that the defendant was arrested by U.S. agents abroad, the arrest would not "rise to that especial-level of outrageous government conduct that would warrant the dismissal of a duly-returned indictment." It denied the motion accordingly.

Castillo then filed two motions in limine that are relevant to this appeal. Castillo moved to exclude testimony that provided an "overview" of the conspiracy investigation. Castillo argued that such evidence would not be relevant; would have probative value that was outweighed by prejudicial effect; and would violate his Fifth and Sixth Amendment rights. The court deferred ruling on the motion, which Castillo filed just a few days before trial, explaining that it would instead "rule as questions [we]re asked" at trial. Separately, Castillo sought to exclude evidence about his participation in drug trafficking activities prior to the charged time period under Federal Rules of Evidence 403 and 404(b). The court explained that "the fact that certain events fall outside the particular charged period of the conspiracy does not trouble me much because it's a course of conduct and that's admissible," but that it would likewise "take it question by question."

## B. Trial

Because Castillo raises so many challenges relating to the trial proceedings, we describe the trial in some detail.

The joint jury trial of Castillo and Heraux began on May 15, 2023.  At the outset, the trial judge informed counsel that "the objection of one defendant is the objection of both."  The judge also instructed that because he "do[es]n't like speaking objections," in order to object, counsel should "just say, 'I object,'" and "that's sufficient for [him]."

The government opened its case-in-chief with the testimony of Trooper Brian Simpkins, the co-case agent leading the investigation of Castro, Heraux, and Castillo.  Simpkins testified that, in the course of investigating another individual, he learned that Castro was selling drugs and opened an investigation.  A wiretap of Castro's communications led Simpkins to begin investigating Heraux, as well.  This led to the discovery of six vehicles used by the targets that law enforcement would later discover were outfitted with hidden compartments that were used to store drugs or money.  Two of these vehicles were registered to Castillo's brother.  After another of the vehicles was used to deliver a sample of fentanyl to an informant, Simpkins opened an investigation into Castillo.

The investigation led Simpkins to identify various locations associated with the drug operation, including the stash

- 6 -

house at 800 Hyde Park Avenue. It also led the government to tap a number of phones, including a phone used by Castro which was in contact with Heraux and Castillo.

Simpkins observed a few salient interactions during the investigation. On August 26 and 31, 2020, he observed Heraux make deliveries of cash to an undercover officer and two women, respectively. On December 14, 2020, while Simpkins was following one of the vehicles registered to and used by Heraux, he saw Castillo. Castillo drove to 800 Hyde Park Avenue. Data from Heraux and Castro's phones indicate that they, too, were at 800 Hyde Park Avenue that day. On January 8, 2021, Simpkins observed Heraux conduct another money drop. An officer stopped Heraux's vehicle, which Simpkins then searched. Simpkins found $150,000 in the vehicle's hidden compartment.

On March 23, 2021, Simpkins and other officers executed a number of search and arrest warrants. Simpkins arrested Heraux at his residence, where Simpkins also found keys to 800 Hyde Park Avenue and a temporary license for Castillo. At 800 Hyde Park Avenue, agents found ledgers, drug paraphernalia, and multiple kilograms of fentanyl.

The government then presented testimony from Castro. Castro had already pled guilty to conspiracy to distribute fentanyl and conspiracy to commit money laundering. He testified for the government in hopes of receiving a lighter sentence -- a fact that

counsel made clear to the jury. Castillo's defense rested in large part on challenging Castro's credibility. Castro testified as follows.

Castro had known Castillo since the pair's teenage years. In 2004, Castro entered the U.S. illegally and began selling drugs in Boston before turning to work with Castillo at Castillo's parents' bodega. However, Castro went back to drug dealing and was arrested and deported. He returned to the U.S., again illegally, and lived for a time with Castillo in Boston. In 2017, Castro began selling fentanyl with Castillo, Heraux, and others. They stored the drugs at 800 Hyde Park Avenue. During this time, Castro and Castillo prepared the drugs and picked up the money from drug sales, but sent Heraux and an associate to deliver the drugs using the cars with hidden compartments.

Castro testified that from 2019 to 2021 -- which includes the charged time period -- Castillo primarily lived in Mexico with his girlfriend, although he traveled back and forth to Boston. This left Castro "in charge" of the drug operation in Boston. During this time, Castro would communicate with Castillo through WhatsApp using different phone numbers in hopes of avoiding detection by authorities. Castillo would message Castro with a phone number of an intermediary and Castro would send Heraux or another associate to pick up fentanyl from that intermediary. Castillo would provide Castro with the information of customers to

deliver fentanyl to, as well as instructions about what to do with the cash received in exchange. When Castillo visited Boston, he helped the drug operation by, among other things, preparing drugs and assisting with money drops. Castro identified a number of specific times that Castillo helped out in this manner; for example, Castillo accompanied Castro when he conducted countersurveillance for the August 31 money drop.

The government also offered testimony from Detective Lucas Hernandez, who described some of the money laundering that occurred in the case. Hernandez testified that he worked undercover during the investigation by posing as a courier who helped launder money. On April 17, 2020, Hernandez picked up $130,000 from Heraux and an associate pursuant to a conversation with Castro. Hernandez put the money in an undercover bank account, then wired the money to a Colombian money broker in charge of paying the money out to a Mexican money broker who had arranged the transaction. The funds were eventually paid out in Mexico. On August 26, 2020, September 24, 2020, and February 1, 2021, Hernandez participated in similar transactions involving Castro and Heraux to help launder another $100,000, $75,000, and $100,000, respectively. Those funds, too, moved through a Colombian money broker to be paid out in Mexico.

The government offered the corroborating testimony of another undercover officer, Alex Hernandez, who assisted Lucas

Hernandez with some of the money laundering operations. Alex Hernandez further testified about a money laundering operation that he participated in on December 10, 2020. He had arranged the operation by communicating with a phone number ending in 6450, which circumstantial evidence suggested was used by Castillo.

The government then offered the testimony of the other co-case agent on the investigation, Mark Concannon. Concannon introduced various pen register records -- that is, information about the phone numbers that a target phone calls and texts -- that were used in the investigation. Concannon testified that pen registers were used to identify additional targets and verify that wiretaps were working properly. He introduced pen register data indicating that members of the drug organization, including Heraux and Castro, messaged each other over WhatsApp in December 2020. Concannon also introduced evidence of a $1,000 money transfer Castro sent to Sinaloa, Mexico, in November 2019.

Castillo's defense throughout the trial relied primarily on challenging Castro's credibility and highlighting the indirect nature of the evidence against Castillo. Nevertheless, on May 23, the jury found Castillo and Heraux guilty on both counts.

## C. Sentencing

In November 2023, the district court sentenced Castillo to 25 years of imprisonment: 25 years on the drug conspiracy charge

and 20 years on the money laundering conspiracy charge, to run concurrently.  Castillo timely appealed.

As relates to this appeal, over six months later in a different criminal proceeding, the same court sentenced Castro to a total of 39 months of incarceration for his participation in the conspiracy.

### III. Discussion

Castillo now challenges the district court's refusal to dismiss the indictment before trial; certain evidentiary rulings; alleged prosecutorial misconduct; aspects of the jury instructions; and aspects of sentencing.  We address each in turn.

### A. Motion to Dismiss for Outrageous Government Conduct

We begin with Castillo's challenge to the indictment before turning to his trial-related arguments.  We review the denial of the motion to dismiss the indictment de novo.  United States v. Anzalone, 923 F.3d 1, 5 (1st Cir. 2019) (citing United States v. Luisi, 482 F.3d 43, 58 (1st Cir. 2007)).

Castillo asks us to evaluate his position, first raised in his motion to dismiss below, that the trial court should have dismissed the indictment for "outrageous government conduct."  He reiterates that his arrest in the Dominican Republic comprised outrageous government conduct because U.S. Marshals conducted the arrest in a foreign country, violating his due process rights, Department of Justice policy, and the Mansfield Amendment, 22

U.S.C. § 2291(c). There was some disagreement before the district court about whether the U.S. Marshals actually effected Castillo's arrest; the court made no factual findings on the matter, but rather assumed that the facts set forth by the defendant were true. We take the same approach. See United States v. Therrien, 847 F.3d 9, 14 (1st Cir. 2017).

The presence of "outrageous government misconduct" permits a district court to dismiss criminal charges in "very rare instances when the government's misconduct is so appalling and egregious as to violate due process by 'shocking . . . the universal sense of justice.'" Id. (omission in original) (quoting Luisi, 482 F.3d at 59). For example, a case may constitute outrageous government misconduct if (i) law enforcement officers "engineer" or "direct" a crime "from start to finish," id. at 15 (citing United States v. Sneed, 34 F.3d 1570, 1577 (10th Cir. 1994)); (ii) there are "sexual relations between defendants and government agents," such as where the government "consciously set out to use sex as a weapon in its investigatory arsenal," id. (quoting United States v. Cuervelo, 949 F.2d 559, 567 (2d Cir. 1991)); or (iii) "government agents physically or psychologically abuse[]" a defendant, id. at 16 (citing United States v. Santana, 6 F.3d 1, 4 (1st Cir. 1993)). The shocking nature of these benchmarks helps explain why, to date, a claim of outrageous

government misconduct has "never succeeded in our Circuit." *Anzalone*, 923 F.3d at 6.

Nor will this case be the first. The participation of U.S. law enforcement officers in a foreign arrest does not, standing alone, comprise outrageous government misconduct meriting dismissal of underlying criminal charges. Cf. United States v. Alvarez-Machain, 504 U.S. 655, 657 (1992) (holding that defendant who was "forcibly kidnaped" from Mexico at the direction of DEA agents did not "thereby acquire[] a defense to the jurisdiction of this country's courts"). Castillo has offered no authority in support of his novel position that violations of the Mansfield Amendment or Department of Justice policy, on their own, comprise "outrageous government misconduct." Indeed, these alleged violations fall far short of types of misconduct that we have suggested would be "outrageous." See Therrien, 847 F.3d at 15-16 (listing examples). They fall far short of the standard set for outrageous government misconduct in other circuits, as well. See, e.g., United States v. Twigg, 588 F.2d 373, 380-81 (3d Cir. 1978) (outrageous government misconduct where government supplied defendants with key ingredient and know-how to make drugs, purchased drug-making supplies, and secured laboratory location, without which defendants could not have made drugs). The purported violations here involved only U.S. Marshals arresting Castillo abroad without "advance approval" from the Department of Justice.

This course of action hardly "shock[s] . . . the universal sense of justice." Therrien, 847 F.3d at 14 (quoting Luisi, 482 F.3d at 59). We accordingly affirm the district court's refusal to dismiss the indictment.

## B. Evidentiary Objections

We turn to Castillo's trial-related claims, beginning with his evidentiary challenges. Castillo challenges the admission of certain evidence of his prior drug-dealing activity; pen register data; evidence of a wire transfer to Sinaloa, Mexico; and certain "overview" testimony. He also argues that these alleged errors in the aggregate require reversal of his conviction.

As we will explain below, Castillo preserved some -- but not all -- of these challenges by raising them to the trial court. We review preserved evidentiary objections for abuse of discretion. United States v. Maldonado-Peña, 4 F.4th 1, 29 (1st Cir. 2021) (quoting United States v. Colón-Díaz, 521 F.3d 29, 33 (1st Cir. 2008)). If a trial court abused its discretion in its evidentiary ruling, "then we vacate the conviction unless the error was harmless." United States v. García-Sierra, 994 F.3d 17, 26 (1st Cir. 2021) (citing United States v. Brown, 669 F.3d 10, 24 (1st Cir. 2012), and Fed. R. Crim. P. 52(a)). An error is harmless when the judgment "was not substantially swayed by the error." United States v. Villa-Guillen, 102 F.4th 508, 515 (1st. Cir. 2024)

(quoting United States v. Burgos-Montes, 786 F.3d 92, 114 (1st Cir. 2015)).

We review unpreserved challenges, on the other hand, for only plain error. See United States v. Leoner-Aguirre, 939 F.3d 310, 320 (1st Cir. 2019); Fed. R. Crim. P. 52(b). Plain error familiarly requires "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Encarnacion, 26 F.4th 490, 504 (1st Cir. 2022) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). The plain error standard is demanding in recognition that typically "a defendant must timely -- and specifically -- raise an evidentiary objection to preserve his or her appellate rights." United States v. Pires, 138 F.4th 649, 664 (1st Cir. 2025). It is a backstop to ensure that the appellate court may "correct 'blockbusters'" but does not reach "ordinary backfires which may mar a trial record." United States v. Madsen, 809 F.3d 712, 717 (1st Cir. 2016) (cleaned up) (quoting United States v. Griffin, 818 F.2d 97, 100 (1st Cir. 1987)).

This case involves one unusual consideration in our assessment of preservation: the trial judge instructed counsel not to explain their speaking objections during the trial. Typically, "[t]o preserve a claim of error for appellate review, an objection

must be sufficiently specific to call the district court's attention to the asserted error." United States v. Perez-Delgado, 99 F.4th 13, 20 (1st Cir. 2024) (quoting United States v. Soto-Soto, 855 F.3d 445, 448 n.1 (1st Cir. 2017)). At the same time, we do not require "exquisite precision" and can consider the overall context of the objection to assess whether it was preserved. Id. (quoting United States v. Rivera-Berríos, 968 F.3d 130, 134 (1st Cir. 2020)). When determining whether Castillo preserved his evidentiary claims, then, we consider his objections in their overall context, including the trial court's response, to most fairly determine the basis upon which the objection was lodged. See, e.g., Villa-Guillen, 102 F.4th at 521 n.11 (using what the "district court understood" as a basis for determining preservation). In addition, because the trial judge informed the parties that "the objection of one defendant is the objection of both," we follow suit and treat any objections lodged by Heraux's counsel as preserved by Castillo. See United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993) (taking the same approach).

### 1. Evidence of Prior Drug-Dealing

Castillo first submits that the trial court abused its discretion in admitting evidence related to certain prior drug-dealing activity in violation of Federal Rules of Evidence 404(b) and 403. He challenges the admission of testimony from Trooper Simpkins about a fentanyl sample delivery in January 2019,

before the beginning of the charged time period, as well as Castro's testimony about participating in drug dealing with Castillo before the charged time period.

Castillo had sought to exclude evidence about his prior drug-dealing activity in a motion in limine filed days before trial began. That motion sought to exclude any testimony from Castro about Castillo's "drug trafficking and money-laundering activities" prior to the dates of the charged conspiracy, including an instance in January 2019 in which Castillo delivered a sample of fentanyl. The court explained orally at the start of trial two days later that it was not "trouble[d] that 'certain events f[e]ll outside the charged period of the conspiracy . . . because it's a course of conduct and that's admissible.'" It noted, however, that it was "not ruling" on the motion in limine but would instead "take it question by question."

### i. Trooper Simpkins' Testimony About the 2019 Sample Delivery

We first address Castillo's challenge to Trooper Simpkins' testimony about the 2019 sample delivery. At trial, Simpkins testified that he saw a certain car[3] be used, by unspecified people, to deliver a sample of fentanyl. Castillo objected on unspecified grounds, which the court overruled.

---

[3] Simpkins had testified that the car was registered to a courier of Castillo's, but, in response to Castillo's objection, the court struck that testimony.

Immediately after asking about the sample delivery, the government elicited testimony that Simpkins began an investigation into Castillo after the sample delivery.  Castillo did not object when the government elicited this testimony.

We begin by briefly addressing the latter, unpreserved point: to the degree that Castillo challenges Simpkins' testimony that he opened an investigation into Castillo after observing the fentanyl sample delivery, he has waived the argument.  Where a party neither objects to testimony below nor provides a plain error analysis in his opening brief, he waives the challenge.  See United States v. Rathbun, 98 F.4th 40, 58 (1st Cir. 2024).

We turn to the only remaining evidence for our review: Simpkins' testimony that he saw a sample of fentanyl be delivered.  Prior to trial, Castillo argued that any evidence of the January 2019 fentanyl sample delivery should have been excluded.  Although the motion in limine addressed only anticipated testimony from Castro, when considered in conjunction with Castillo's contemporaneous objection and the district court's instruction not to specify objections, we assume that the issue is preserved and review the court's decision for abuse of discretion.  See United States v. Simon, 12 F.4th 1, 48 (1st Cir. 2021).

Federal Rule of Evidence 404(b)(1) prohibits the introduction of evidence of a person's prior "crime, wrong, or act" to show that the person has a propensity to commit such

- 18 -

crimes, wrongs, or acts.  However, prior-bad-acts evidence may be admitted to prove a non-propensity purpose such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2); see also United States v. Henry, 848 F.3d 1, 8 (1st Cir. 2017). If prior-bad-acts evidence is admissible under Rule 404(b)(2), the court considers whether it should nevertheless exclude it under Rule 403.  The court may exclude evidence under Rule 403 "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  "The standard for exclusion under Rule 403 is a high one," United States v. Soler-Montalvo, 44 F.4th 1, 16 (1st Cir. 2022), and it is a "rare case where we are prepared to second-guess the district court's Rule 403 analysis," Henry, 848 F.3d at 10.

The trial court did not abuse its discretion in permitting Simpkins' limited testimony about the sample delivery. When Castillo's counsel objected to the line of questioning, Simpkins had testified only that a sample delivery occurred, not that Castillo had participated in it.  At that point, the jury had heard no testimony from which it could infer that Castillo was involved in the sample delivery at all.  The testimony therefore did not implicate Rule 404.  And the challenge to Simpkins' ensuing testimony that he then started an investigation of Castillo, as discussed above, is unpreserved and waived.

Even if we assumed without deciding that the trial court abused its discretion in permitting Simpkins' limited testimony about the sample delivery, we could not find reversible error in the instant case. See Lucy v. Gardino, 791 F.2d 980, 986 (1st Cir. 1986) ("We have previously held that in order to determine harmless error 'a reviewing court must assess the record as a whole to determine the impact of the improper evidence upon the jury.... The prejudicial effect of the improper evidence must be weighed against the weight of the properly admitted evidence.'" (quoting Morgan v. Hall, 569 F.2d 1161, 1166 (1st Cir. 1978))). Reviewing the record, it is clear that the government's case as a whole relied on direct testimony from Castro that Castillo participated in the drug operation in numerous ways throughout the charged time period. Castro's testimony was supported by a wide variety of circumstantial evidence, including recorded phone calls and video and personal observations by surveilling law enforcement. On those facts, it is unlikely that an opaque suggestion from Simpkins' testimony that Castillo may have been involved in a 2019 fentanyl sample delivery affected the verdict.

**ii. Castro's Testimony About Castillo's Prior Drug-Dealing**

Castillo next takes aim at Castro's testimony about dealing drugs with Castillo prior to the charged time period. Castillo argues that this constituted impermissible propensity evidence because it encouraged the jury to infer that, because he

had dealt drugs from 800 Hyde Park Avenue in the past, he was more likely part of a later conspiracy dealing drugs from that location.

Castillo preserved this issue: he objected multiple times to Castro's testimony about pre-2020 drug operations, including to the "line of questioning regarding the entire operation that is not part of this charged conspiracy." We accordingly review for abuse of discretion. Simon, 12 F.4th at 48.

Castillo acknowledges that Rule 404(b)'s permissible purposes include demonstrating "co-conspirators' relationship of mutual trust." United States v. Weadick, 15 F.4th 1, 18 (1st Cir. 2021). And although Castillo gestures at arguing that Castro's testimony nevertheless violated Rule 404(b), he waived the argument by doing so only in a perfunctory footnote. See Tax-Free Fixed Income Fund for P.R. Residents, Inc. v. Ocean Cap. LLC, 137 F.4th 6, 24 (1st Cir. 2025) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived." (quoting P.R. Tel. Co. v. San Juan Cable LLC, 874 F.3d 767, 770 (1st Cir. 2017))). Instead, Castillo primarily argues that the admitted evidence violated Rule 403 because it was unnecessary and minimally probative to demonstrate a relationship of mutual trust, given the evidence about his decades-long relationship with Castro, as compared to the prejudicial risk of an impermissible propensity inference.

But even assuming that the district court erred in admitting Castro's testimony about pre-2020 drug operations, we find no reversible error. As explained above, the record illustrates that the government's case relied on Castro's supported testimony about Castillo's participation in the drug operation during the charged time period. Thus, it is unlikely that Castro's testimony about pre-2020 drug operations affected the verdict.

## 2. Pen Register Data

Castillo moves on to assert that information collected by pen registers and compiled by the government was inadmissible hearsay to which the business records exception, Fed. R. Evid. 803(6), did not apply. In Castillo's telling, certain admitted exhibits consisted of information provided by phone companies and then compiled by the Drug Enforcement Administration ("DEA"), but the government did not offer evidence that the business records exception applied to the information collected by the phone companies. It only offered evidence showing that the DEA compiled the data in the regular course of its practice, which, Castillo says, is not sufficient to permit the introduction of the underlying data. The government rejoins that pen register data is not hearsay at all because it is not an assertion by a person: it

is machine-generated data collected in real time pursuant to court order.

As an initial matter, it is not clear that Castillo preserved the challenge to the admission of the pen register data. Heraux's counsel objected to the admission of two exhibits that contained pen register data, Exhibits 206 and 210, for unspecified reasons. The trial judge overruled the objections for equally unspecified reasons. The record does not suggest that either the objection or the responsive ruling was based on a hearsay objection. At the same time, it is difficult to fault counsel for this opacity given that the judge directed the parties not to state the grounds for speaking objections at the start of trial and later told counsel that he did not "see the necessity" for a more fulsome explanation of the objection to Exhibit 206. We assume without deciding, then, that the issue was preserved because Castillo loses under both abuse of discretion and plain error review. See United States v. Soto, 799 F.3d 68, 97 n.17 (1st Cir. 2015) (taking the same approach).

During the government's case-in-chief, Trooper Simpkins explained that a pen register collects data about a target phone's interactions with other phone numbers but that it does not capture the content of any calls or messages. Simpkins testified that, in this investigation, pen registers were installed at the same time as wiretaps to make sure that the wiretaps were working properly.

The witness who introduced the pen register exhibits themselves, Officer Concannon, further explained that "[a] pen register is a court order for a telephone number that goes to the service provider, and the service provider then gives [the DEA] the calls and the text message ingoing and outgoing from the number." Specifically, "[p]ursuant to the order, the data is collected into a database that [the DEA] ha[s] that uploads all the information." The data that the pen registers collected in this case include subscriber information associated with the target number; the date and time of incoming or outgoing calls; the phone number contacted; and location and IP address information. Thus, the information gathered by pen registers in this case was generated by the provider mechanically, rather than by a person.

"Hearsay" is a statement made by a "declarant," who is a "person." See Fed. R. Evid. 801. A machine (at least in 2025) is not a person. In the ordinary course, then, machine-generated data is not hearsay. See, e.g., United States v. Miller, 982 F.3d 412, 437 (6th Cir. 2020) ("[Courts] have recognized that machine-generated information does not qualify as 'hearsay' under the rules of evidence because the information is not a statement by a person."); United States v. Channon, 881 F.3d 806, 810-11 (10th Cir. 2018) (machine-generated transaction records in Excel spreadsheets are not hearsay); United States v. Lizarraga-Tirado, 789 F.3d 1107, 1109-10 (9th Cir. 2015) (location markers generated

on image by Google Earth are not hearsay because Google Earth is not "a person"); United States v. Washington, 498 F.3d 225, 230-31 (4th Cir. 2007) (raw data generated by machines using a "common scientific and technological process" are not hearsay); United States v. Lamons, 532 F.3d 1251, 1263-64 (11th Cir. 2008) ("statements of machines" that are not altered by humans are not hearsay). The premise of Castillo's position, then -- that the data from the pen register given by the provider to DEA is hearsay in the first place -- does not bear weight. We conclude that the district court did not abuse its discretion in admitting the exhibits.

Contrary to Castillo's assertions, our decisions in United States v. Benavente Gomez, 921 F.2d 378 (1st Cir. 1990), and United States v. Moore, 923 F.2d 910 (1st Cir. 1991), do not require a different result. In Benavente, we addressed a challenge to the admission of telephone toll records under Federal Rule of Evidence 803(24), the residual hearsay exception. 921 F.2d at 383-84. In conducting our analysis, we did not consider whether the data at issue was, in fact, hearsay. Id. We accordingly do not think that Benavente directs the outcome here. And in Moore, we agreed that "loan histories" that were created by humans, stored on a computer, and then printed out from the computer were hearsay (in fact, no party to that case took the position that they were not). 923 F.2d at 914. Moore, too, does not bear on the current

case.  Where the underlying information in a document is made by a person, the mere involvement of a machine in assembling that information does not render the underlying assertion non-hearsay. See id.  By contrast, information or data that a machine automatically collects is not a statement by a person and is therefore not hearsay.

Finally, Castillo challenges the admission of exhibits containing a subset of already-admitted pen register data.  He faults inconsistencies between admitted exhibits 206 and 210 and their sub-exhibits 206.2 and 210.2.  The trial court admitted sub-exhibits 206.2 and 210.2 after Concannon testified that they contained subsets of the data contained in exhibits 206 and 210 (which had already been admitted).  Because Heraux's counsel objected to the sub-exhibits, we review their admission for abuse of discretion.

This argument is unavailing because even were it error to admit the sub-exhibits, that error was harmless.  Castillo has not articulated any manner in which the admission of the sub-exhibits -- as opposed to the main exhibits -- allegedly prejudiced him.  See United States v. Carbone, 110 F.4th 361, 383-84 (1st Cir. 2024) (no prejudice where defendant fails to explain theory of how prejudice resulted).  Castillo says that the government's reference to the pen register records in closing argument caused prejudice, but he does not point to any instance

in which the government referenced or relied specifically on the sub-exhibits.  Nor do we see anything else in the record indicating that the government relied on the sub-exhibits themselves.  Even were there error, then, we have "a fair degree of assurance that the erroneous ruling did not substantially sway the jury."  Id. (quoting Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 87 (1st Cir. 1998)).

### 3. Wire Transfer to Sinaloa

Castillo next argues that evidence of a single $1,000 wire transfer to Sinaloa, Mexico, should have been excluded under Rule 403.  Castillo contends that this evidence was not relevant and that it improperly suggested that Castillo was affiliated with the Sinaloa cartel, which caused unfair prejudice.

Castillo objected below to the admission of the exhibit documenting the wire transfer on the grounds of its relevance.  He made no objection on the basis of unfair prejudice.  Instead, after the government explained its theory of the exhibit's relevance, the court asked if Castillo withdrew his objection.  Counsel did not respond and the exhibit was admitted.  The trial court, then, had no "notice of the error" and no opportunity to conduct the balancing test set forth in Rule 403.  Perez-Delgado, 99 F.4th at 20 (quoting United States v. Colón-Cordero, 91 F.4th 41, 50 (1st Cir. 2024)).  At most, then, our review of this unpreserved

challenge is for plain error.  United States v. Rivera Calderón, 578 F.3d 78, 95 (1st Cir. 2009).

Castillo hastily mentions a plain error argument in his brief.  But he puts no "flesh on its bones."  United States v. Severino-Pacheco, 911 F.3d 14, 20 (1st Cir. 2018) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).  When an appellant "fails to even attempt to explain how the plain error standard has been satisfied," he waives the argument.  Id. Castillo has accordingly waived his claim that admitting the wire transfer evidence was plain error.

### 4. "Overview" Testimony

Next up is Castillo's claim that the district court erred in admitting multiple instances of "overview testimony." "Typically, '[a]n overview witness is a government agent who testifies as one of the prosecution's first witnesses and . . . provides an overview or roadmap of the prosecution's case to come.'"  United States v. Reyes, 24 F.4th 1, 22 (1st Cir. 2022) (omission in original) (quoting United States v. Etienne, 772 F.3d 907, 913 (1st Cir. 2014)).  Overview testimony "based on the results of the agency's overall investigation, rather than on [the witness's] own personal knowledge or participation," is disfavored.  Id. (quoting Etienne, 772 F.3d at 913-14).

We assess each instance of alleged impermissible overview testimony.[4] Castillo first challenges Trooper Simpkins' testimony during cross-examination by Heraux's counsel that Simpkins thought that a certain phone was "used by Castillo."[5] Heraux's counsel asked Simpkins if certain "paperwork" about the phone "was targeting Mr. Castro." Simpkins replied, over the government's objection, that the phone was "used by Mr. Castillo." Castillo's counsel moved to strike the answer. The court then questioned Simpkins directly, clarifying that Simpkins had obtained the information that Castillo used the phone number from an undercover officer and that Simpkins did not have personal knowledge that Castillo used the number. The court concluded, "[w]e'll let that stand for what it's worth," reaffirming that the witness "personally d[id not] know."

This exchange bears none of the hallmarks of impermissible overview testimony. Trooper Simpkins provided this testimony in response to questions posed by Heraux's counsel on

---

[4] Castillo nests some other evidentiary challenges in the "overview testimony" section of his brief. For example, he offers a list of testimony that he says violates the rule against hearsay, the best evidence rule, authentication requirements, and the Due Process Clause. But because Castillo does not explain how the challenged testimony violates the cited rules, he waives these challenges. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[5] Castillo also cites to Trooper Simpkins' separate testimony on direct examination that Castillo used the phone in question; however, the trial court struck that testimony.

cross-examination, not in response to questioning by the government.  The testimony did not set forth an overview or roadmap of the investigation.  And it was elicited in the context of explaining how Simpkins had refreshed his recollection to answer a different question altogether.  We do not discern an abuse of discretion in permitting this testimony.

Castillo next takes issue with Concannon's identification of the property management company that managed 800 Hyde Park Avenue.  Concannon testified that he had personal knowledge that a certain company was the property manager for the building.  The testimony was based on his personal knowledge as co-case agent on the investigation.  We do not see how this, either, would amount to impermissible overview testimony.

We turn to testimony from Trooper Simpkins that the government elicited after showing Simpkins certain documents to refresh his recollection.  Castillo theorizes that Simpkins had no personal knowledge from which his recollection could be refreshed.  This theory appears to be completely speculative.  Simpkins testified that the documents jogged his independent memory of the investigation and that he was not merely "reading the document."  Castillo's speculation to the contrary is not a sufficient reason for us to doubt that testimony.

Castillo's last effort is that Concannon impermissibly used the word "we" when explaining his investigation into another

member of the drug operation. He cites United States v. Vázquez-Rivera, which found use of the collective "we" to be improper in cases where witnesses use it to offer "'lay opinion[s]' as to a person's culpable role in a charged crime" that are not based on their personal perceptions. 665 F.3d 351, 358-59 (1st Cir. 2011) (quoting United States v. García, 413 F.3d 201, 212 (2d Cir. 2005)). The present case, however, poses no such issue: Concannon was the co-case agent who personally participated in the investigation alongside Trooper Simpkins, who had himself testified at length about the investigation. If anything, the jury likely assumed that Concannon used the word "we" to refer to himself along with his co-case agent Simpkins. The use of "we" was perfectly proper in this context. And Castillo's challenge to use of the word "we" in undercover agent Lucas Hernandez's description of the movement of laundered funds fares no better. Hernandez testified that funds he picked up in his undercover capacity moved through a Colombian money broker to be paid out in Mexico. Castillo baselessly speculates that, because Hernandez testified that "we" wired the funds, Hernandez did not have personal knowledge of the funds' movements. Castillo offers no support for this theory, leaving us with no reason to doubt that Hernandez testified based on his personal knowledge, as he claimed.

We conclude that all of the challenged "overview" testimony was appropriately admitted.

## 5. Cumulative Error

Castillo last contends that the foregoing evidentiary errors, even if insufficient to merit reversal when considered alone, require reversal in the aggregate. "[I]n assessing the force of a claim of cumulative error," we weigh factors "includ[ing] 'the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose . . . ; and the strength of the government's case.'" United States v. Padilla-Galarza, 990 F.3d 60, 85 (1st Cir. 2021) (quoting Sepulveda, 15 F.3d at 1196 (omission in original)). We acknowledge that "the cumulative prejudicial effect of independently innocuous trial errors may warrant a new trial." United States v. García-Sierra, 994 F.3d 17, 36 (1st Cir. 2021) (citing United States v. Peña-Santo, 809 F.3d 686, 702 (1st Cir. 2015)). "But here, for the same reasons that we find each of the evidentiary errors which we have identified harmless, we find them collectively so as well." Id.

## C. Prosecutorial Misconduct

We turn to Castillo's prosecutorial misconduct argument. Castillo submits that the government improperly misstated evidence and appealed to community emotion in its opening and closing arguments, comprising prosecutorial misconduct. He agrees that, because he did not raise the issue below, our review is for plain

error.  See United States v. Vavic, 139 F.4th 1, 21 (1st Cir. 2025).

When assessing such claims of prosecutorial misconduct, "the plain error standard requires the court first to determine whether the challenged comment is obviously improper, that is, whether the first two prongs of the plain error standard have been satisfied."  United States v. Correia, 55 F.4th 12, 48 (1st Cir. 2022) (quoting United States v. Walker-Couvertier, 860 F.3d 1, 10 (1st Cir. 2017)).  If so, we consider whether the improper comment "'so poisoned the well' that the trial's outcome was likely affected."  United States v. Azubike, 504 F.3d 30, 39 (1st Cir. 2007) (quoting United States v. Joyner, 191 F.3d 47, 54 (1st Cir. 1999)). To make this assessment, we consider "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant[]."  United States v. Vázquez-Larrauri, 778 F.3d 276, 283 (1st Cir. 2015) (alteration in original) (quoting United States v. Kasenge, 660 F.3d 537, 542 (1st Cir. 2011)).

## 1. Opening Statement

Castillo first takes aim at the government's characterization in its opening statement of the drug operation as one in which drugs were sent from Mexico to Massachusetts in

- 33 -

exchange for money.  He says that there was no evidence that the fentanyl involved in the case was manufactured in Mexico as opposed to, say, Massachusetts.  And he challenges the government's characterization of his move to Mexico as intended "to secure a direct connection of fentanyl supply."

In an opening statement, the government is not summarizing evidence: no evidence has yet been presented.  Instead, it is providing a roadmap of the evidence it expects to present over the course of the trial.  "Many things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance."  Frazier v. Cupp, 394 U.S. 731, 736 (1969).  For this reason, we typically require more than an incorrect prediction of the evidence to find prosecutorial misconduct in an opening statement -- we require "particularized allegations of bad faith on the part of the government."  United States v. Cruz, 156 F.3d 22, 31 (1st Cir. 1998).

Castillo makes no "particularized allegation[] of bad faith on the part of the government."  Id.  In fact, the government's opening -- although it overstated the extent of evidence about the fentanyl's provenance in Mexico -- did not otherwise contain incorrect predictions of the evidence to be presented.  The government did ultimately present evidence suggesting that money from the drug trafficking operation ended up in Mexico.  And Castro testified that he "suppose[d]" that the

fentanyl originated in Mexico. Considered in context, then, we think that "the evidence presented at trial would have corrected any jury misperception arising from the government's opening statement." Id. We also recognize that the government may have intended to introduce additional evidence about "how drug organizations routinely work" that may have substantiated its description of the drugs' Mexican origin; however, the court (appropriately) warned the government to stick to the facts of the case at hand.

Even more, any inaccurate emphasis on the drugs' provenance in Mexico in opening did not prejudice the trial's outcome. The judge twice informed the jury before trial began that opening statements (and statements by lawyers in general) are not evidence. And as we have discussed, "the evidence against the defendant[]" was strong. Vázquez-Larrauri, 778 F.3d at 283 (alteration in original) (quoting Kasenge, 660 F.3d at 542). We discern no misconduct -- and certainly no prejudicial misconduct -- in the government's opening descriptions of the fentanyl's movement.

In a different vein, Castillo says that emphasizing the drugs' provenance in Mexico and ensuing transport to Massachusetts improperly appealed to community emotion. Castillo is correct that "[i]t is improper to appeal to the 'jury's emotions and role as the conscience of the community.'" United States v. Canty, 37

F.4th 775, 787 (1st Cir. 2022) (quoting United States v. Avilés-Colón, 536 F.3d 1, 4 (1st Cir. 2008)). But he fails to point to any impermissibly emotional tenor of the prosecution's argumentation. Describing fentanyl as "strong" and "pure," as the government did here, is a far cry from the type of emotional appeal we have found to be impermissible, such as casting defendants as "greedy outsiders" who "exploit[ed]" the "suffering" and "vulnerable" addicts in a community. Canty, 37 F.4th at 786-87.

Castillo further disputes the accuracy of two other statements that the government made in opening: that he and other co-defendants went to 800 Hyde Park Avenue (the stash house where fentanyl was ultimately seized) "over and over," and that officers "observed these defendants moving around, distributing fentanyl, and laundering money." We agree that these assertions overstate the evidence that would eventually be presented with respect to Castillo. The evidence ultimately showed that Castillo accompanied Castro on an August 31 money drop after which he returned to 800 Hyde Park Avenue, and that on December 14, 2020, a car Castillo was seen in drove to that address. But considered in the context of the judge's multiple limiting instructions and the preliminary nature of the comments, we do not think that this exaggeration "'so poisoned the well' that the trial's outcome was likely affected." Azubike, 504 F.3d at 39 (quoting Joyner, 191 F.3d at 54).

## 2. Closing Statement

Castillo also challenges a number of statements made in closing argument. "[A]n incorrect recitation of either the evidence or the record in a closing argument may constitute prosecutorial misconduct." Madsen, 809 F.3d at 717.

Castillo posits that reference to "Sinaloa," Mexico, in describing a wire transfer improperly prejudiced the jury due to jurors' likely knowledge of Sinaloa as home to the infamous drug cartel of the same name. But the inclusion of the word "Sinaloa" was an accurate characterization of properly admitted evidence. See supra Part III.B.3; United States v. Veloz, 948 F.3d 418, 436 (1st Cir. 2020) (finding that there is "nothing improper in the prosecutor referring" to statements that "were properly admitted"). And Castillo provides no support for his theory that the prosecution used the word "Sinaloa" in order to improperly invoke supposed juror prejudice.

Castillo next says that the government's statement that "money was being dropped off so that it could be sent back to Mexico where Castillo was residing, waiting to send the next shipment of drugs to the United States," was unsupported by evidence. To the contrary, undercover officer Alex Hernandez testified about three money pick-ups that he participated in which were "paid out" in Mexico. In conjunction with evidence that Castillo resided in Mexico and organized drug and money deliveries

for Castro to complete, this was no "incorrect recitation" of the evidence. Madsen, 809 F.3d at 717.

Castillo next posits that the government misstated the evidence when it said that Trooper Simpkins testified that Castillo used a phone number ending in 8236. The government admits that this statement was erroneous because the supporting testimony had been stricken from the record. Nevertheless, the misstatement did not prejudice Castillo. "Especially under plain error review, we must assess the prosecutor's statements 'within the context of the case as a whole.'" Id. (quoting United States v. Pires, 642 F.3d 1, 14 (1st Cir. 2011)). Independent evidence that was properly admitted connected Castillo to that phone number. The government's overall point, then -- that Castillo was connected to the phone number -- was no misstatement. And again, the court had instructed the jury that the statements proffered by lawyers in closing arguments were not evidence. We therefore do not think it "likely that the misconduct affected the trial's outcome." Canty, 37 F.4th at 791.

Castillo next says the government misstated evidence when it told the jury that Castro had testified that he was present while Castillo was talking to a person in New York who arranged the August 31 money drop. Castro had in fact testified that he did not "exactly" remember whether he was there. But the probative part of Castro's testimony was not that Castro had been physically

- 38 -

present to listen to the conversation, but that upon hearing the recording on the stand, he identified the speaker as Castillo. The government's misstatement regarding Castro's proximity to Castillo at the time of the call, then, did not misstate Castro's testimony in a way that implicates the jury's verdict.

Finally, Castillo challenges the government's misstatement of the last date on which he communicated with Heraux: the prosecutor said February 27, rather than February 22. And he faults the government's misstatement of Hernandez's testimony recounting asking Castro for drugs: the prosecutor said Castro said he had to check with "the boss," when Castro actually said that he had to check with "the woman." Castillo fails to explain why either misstatement would necessitate a new trial. As the government points out, it corrected the misstated date in rebuttal. Again, the judge had just reminded the jury that it was the jurors' memory of the evidence -- not the lawyers' summary -- that governs. We determine that neither misstatement prejudiced the jury's verdict. In sum, no prosecutorial misconduct requiring a new trial occurred in this case.

### D. Jury Instruction on Interstate Commerce

Moving on, we evaluate whether the district court's failure to instruct the jury on an element of the money laundering statute amounted to plain error. The parties agree that Castillo

did not preserve the issue.  We determine that Castillo waived the plain error argument.

The federal money laundering statute requires that the illicit financial transaction at issue affect interstate or foreign commerce.  See 18 U.S.C. § 1956(c)(4).  The parties agree that the jury instructions did not describe the interstate or foreign commerce requirement and that this omission amounted to a "clear or obvious error."  For an error to be plain, though, the error must also affect a defendant's "substantial rights -- but even then we can still affirm if [he] does not show as well that the error seriously harmed the fairness, integrity, or public perception of [his] trial."  United States v. Andino-Rodríguez, 79 F.4th 7, 28 (1st Cir. 2023) (quoting United States v. Cruz-Ramos, 987 F.3d 27, 39 (1st Cir. 2021)).

Castillo does not explain how the incomplete instruction affected his substantial rights or seriously harmed the fairness, integrity, or public perception of his trial.  He has accordingly waived the argument that the error here was plain.  See United States v. Velázquez-Aponte, 940 F.3d 785, 800 (1st Cir. 2019) (defendant "waived his claim of error by failing to address the fourth prong of plain error review -- that the alleged error seriously impaired the fairness of the judicial proceedings").

### E. Sentencing Challenges

Having affirmed Castillo's conviction, we turn to his claims of sentencing error.

### 1. Apprendi and Alleyne Error

Castillo asserts that his sentence violated the principles set forth in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Alleyne v. United States, 570 U.S. 99 (2013). We review a preserved Apprendi or Alleyne issue de novo. United States v. Trahan, 111 F.4th 185, 197 (1st Cir. 2024).

Apprendi instructs that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury[] and proved beyond a reasonable doubt." United States v. Pizarro, 772 F.3d 284, 288 (1st Cir. 2014) (quoting Apprendi, 530 U.S. at 490). Alleyne clarified that Apprendi applies to any fact that increases the mandatory minimum penalty for a crime. Alleyne, 570 U.S. at 103. In Castillo's case, the trial court determined that the drug conspiracy charge (Count 1) carried an increased mandatory minimum penalty of 15 years' imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A). That statute prescribes a 15-year mandatory minimum when: (1) the offense involving "400 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide," 21 U.S.C. § 841(b)(1)(A)(vi), and (2) the defendant had been

convicted of a prior serious drug felony in the past, <u>id.</u> § 841(b)(1)(A).

Castillo's challenge is premised on a discrepancy between the language of Section 841(b)(1)(A)(vi) and the jury's verdict. The jury found that the offense involved 400 grams or more of "fentanyl" rather than "N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide," which is fentanyl's chemical name. Castillo contends that this discrepancy means that the calculated sentencing range impermissibly rested on "extra-record speculation" that "fentanyl" is the same thing as "N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide."

However, while Castillo objected to the use of the word "fentanyl" at sentencing, he did not object to the verdict form itself based on the use of that word nor did he level objections to the use of that word throughout the trial. Specifically, when discussing the verdict form, the district court read on the record that he intended to charge count one as "conspiracy to distribute and to possess with intent to distribute 400 grams or more of fentanyl." The objection from Castillo that ensued focused, not on the word "fentanyl," but on how -- if Castillo is found guilty of conspiracy to possess and distribute over 400 grams of fentanyl -- the district court would be able to determine the specific drug quantity for sentencing purposes.

It is true that the record does not contain references to fentanyl's chemical name. But it is also true that the record is replete with references to fentanyl, yet devoid of objections to that term such that it is unconvincing to claim extra-record knowledge is needed to establish that N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide is fentanyl. For example, the jury immediately heard during the government's opening statement that "[t]his case is about kilograms and kilograms of fentanyl." There is no indication that Castillo's counsel objected to the word choice. For these reasons, Castillo's argument is waived.

### 2. Procedural and Substantive Reasonableness

Castillo last lodges three complaints about the reasonableness of his sentence. He seeks review of the sentencing court's application of the two-level "stash house" enhancement under the United States Sentencing Guidelines ("guidelines"), U.S.S.G. § 2D1.1(b)(12); the propriety of the government's purported reference to a Sinaloa-based cartel during sentencing; and the 261-month sentencing disparity between himself and Castro.

We review a preserved challenge to the procedural or substantive reasonableness of a sentence under "a multifaceted abuse-of-discretion standard," reviewing "the sentencing court's findings of fact for clear error and questions of law (including the court's interpretation and application of the sentencing

- 43 -

guidelines) de novo." United States v. Aponte-Colon, 104 F.4th 402, 414-15 (1st Cir. 2024) (first quoting United States v. Sierra-Jiménez, 93 F.4th 565, 569 (1st Cir. 2024), and then quoting United States v. Carrasquillo-Vilches, 33 F.4th 36, 41 (1st Cir. 2022)); see also United States v. Polaco-Hance, 103 F.4th 95, 100 (1st Cir. 2024).

### i. "Stash House" Enhancement

The federal sentencing guidelines provide a two-level enhancement to a base offense level "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). Castillo objected to the application of this enhancement because, in his view, there was insufficient evidence to prove that he "maintained" the premises. He says that the "only trial evidence" relevant to the enhancement was that a phone he purportedly used had contacted the property's management company. Castillo contends that there was some factual error and that the property management company did not actually manage the property during the relevant time. Therefore, according to Castillo, the court committed procedural error by improperly calculating the guidelines range. See Gall v. United States, 552 U.S. 38, 51 (2007).

The government must prove that a sentencing enhancement applies by a preponderance of the evidence. United States v. González-Santillan, 107 F.4th 12, 18 (1st Cir. 2024). At

- 44 -

sentencing, the government summarized other evidence presented at trial -- besides Castillo's alleged contact with the property management company -- to show that Castillo "maintained" the premises at 800 Hyde Park Avenue. This included evidence that Castillo leased and had keys to the apartment and used the apartment to conduct drug dealing activity when he was in Boston. This evidence was sufficient for the sentencing court to find that Castillo maintained the premises. In addition, the jury found that "the government proved beyond a reasonable doubt that Fermin Castillo maintained a premises for the purposes of manufacturing or distributing a controlled substance." The jury's finding undergirds our confidence that the sentencing court did not abuse its discretion by finding, by a preponderance of the evidence, that the enhancement applied.

### ii. Connection to Sinaloa Cartel

We turn to Castillo's argument that the government inaccurately said that he acted on behalf of "a Sinaloa, Mexico based [drug trafficking organization]" at sentencing. Castillo says that the reference may have affected the sentence because "the government argued it in advocating for the exact 300-month sentence that the court subsequently imposed." Contrary to Castillo's representation, the government never mentioned Sinaloa in either its sentencing memorandum or at sentencing. The government did argue that Castillo acted on behalf of a Mexico-

based drug trafficking organization; however, Castillo does not describe how the mention of Mexico specifically was procedurally or substantively unreasonable. The argument accordingly fails.

### iii. Sentencing Disparity

Castillo last argues that his sentence is unreasonable because it is over 20 years longer than Castro's, even though they were similarly culpable participants in the same conspiracies. This discrepancy is troubling on its face. We determine, however, that the sentence was not unreasonable because Castro and Castillo are not similarly situated co-conspirators, and Castillo has not shown that his downwardly variant sentence is unreasonable.

Castillo was sentenced to 300 months of incarceration on November 28, 2023. The sentencing court calculated Castillo's total offense level as 40 which, in conjunction with his criminal history category of III, correlated to a guidelines sentencing range of 360 months to life. Castillo had advocated for a ten-year sentence, reasoning in part that a ten-year period would minimize disparities with three other members of the drug organization who had already been sentenced. For example, one of the organization's primary drug couriers received a 60-month sentence, and another lower-level participant received one day time served. At the time, Castro had not been sentenced. Castillo's counsel noted in his sentencing memorandum that Castro had "testified to being a relatively equal participant with Mr. Castillo" and that Castro

would "predictably benefit from a government motion to avoid the applicable statutory minimum." At sentencing, counsel reiterated his prediction that Castro "is very likely to get a sentence below the otherwise applicable [guidelines sentencing range] or mandatory minimum sentence."

Six months later, on June 6, 2024, the same court sentenced Castro to time served plus four days, amounting to 39 total months of incarceration. This was the sentence that both the government and Castro's counsel recommended. The district court calculated Castro's total offense level to be nearly as high as Castillo's[6] and calculated Castro's criminal history category as II (Castillo's criminal history category was III). Of course, Castro and Castillo differed in another key respect, too: Castro had pled guilty and testified for the government at Castillo's trial.

Castillo now raises both procedural and substantive reasonableness challenges based on the 261-month discrepancy between the co-conspirators' sentences. "Where both types of objections are made, we ordinarily will consider first 'whether the district court committed any procedural missteps and, if the sentence is procedurally sound, we then ask whether the sentence

---

[6] The sentencing court did not clearly state the exact total offense level; it appears that it was either 37 or close thereto.

is substantively reasonable.'" United States v. Reyes-Santiago, 804 F.3d 453, 467-68 (1st Cir. 2015) (quoting United States v. Rossignol, 780 F.3d 475, 477 (1st Cir. 2015)). "In both contexts, we review the district court's discretionary judgments for abuse of discretion, its findings of fact for clear error, and its conclusions of law de novo." Id. at 468 (quoting United States v. Reverol-Rivera, 778 F.3d 363, 366 (1st Cir. 2015)).

Castillo asserts that the sentencing court committed procedural error by failing to acknowledge his predicted disparity argument that Castro would, in the future, "likely . . . get a sentence below the otherwise applicable [guidelines sentencing range] or mandatory minimum sentence." Indeed, sentencing courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). And although this focus "is primarily aimed at national disparities, rather than those between codefendants," we also have "legitimate concerns . . . if a judge sentences similarly situated coconspirators or codefendants to inexplicably disparate terms." United States v. Bishoff, 58 F.4th 18, 25-26 (1st Cir. 2023) (internal quotation marks omitted) (quoting United States v. Candelario-Ramos, 45 F.4th 521, 526 (1st Cir. 2022)).

In this case, however, Castro and Castillo are not similarly situated but are in materially different positions.

- 48 -

Castro pled guilty while Castillo did not. We have previously noted that when one defendant pleads guilty and another does not, that constitutes a material difference of the kind that would preclude a disparity claim. See United States v. Rodriguez-Lozada, 558 F.3d 29, 45 (1st Cir. 2009) ("Given the material difference between the defendants who pled guilty pursuant to plea agreements and [the defendant] who did not, no disparity in sentencing occurred in this case that would amount to an abuse of discretion."). Thus, considering Castro and Castillo's materially different positions, the sentence disparities between the two does not amount to a procedural error.

Castillo's substantive unreasonableness argument fares no better. He says that "[t]here is no reasonable view of the evidence justifying such a stark divergence based on Castillo and Castro's relative culpability" even considering Castro's assistance to the government.

To determine whether a sentence is substantively reasonable, "we ask 'whether the sentence falls within [the] broad universe'" of available reasonable sentencing outcomes. United States v. Concepcion-Guliam, 62 F.4th 26, 36 (1st Cir. 2023) (quoting United States v. Rivera-Morales, 961 F.3d 1, 21 (1st Cir. 2020)). "A sentence will find a home within this broad universe if it rests on 'a plausible rationale and . . . represents a defensible result.'" Id. (omission in original) (quoting Rivera-

Morales, 961 F.3d at 21). "And when -- as in this case -- a defendant challenges a downwardly variant sentence, he must carry a particularly heavy burden to show that the length of the sentence imposed is unreasonable." Id. "We rarely find a below-guidelines sentence to be substantively unreasonable." United States v. Millán-Machuca, 991 F.3d 7, 32 (1st Cir. 2021); see also United States v. Floyd, 740 F.3d 22, 39-40 (1st Cir. 2014) ("When, as in this case, a district court essays a substantial downward variance from a properly calculated guideline sentencing range, a defendant's claim of substantive unreasonableness will generally fail.").

Castillo does not demonstrate that his sentence was unreasonable. His sentence was a 5-year downward departure from the guidelines sentencing range of 360 months to life. And our concern about the stark difference between the length of his sentence and the length of Castro's is obviated by the fact that Castro pled guilty, as discussed above. We find that the sentence is substantively reasonable.

## IV. Conclusion

For the foregoing reasons, we **affirm** Castillo's conviction and sentence.